ALLSTATE INSURANCE COMPANY, Plaintiff-Appellee, *v.* NATIONAL TEA CO. *et al.*, Defendants-Appellants.

(No. 58311;

First District (1st Division)—January 6, 1975.

450

Kirkland & Ellis, of Chicago (Thomas M. Thomas, Donald J. Duffy and Gary M. Elden, of counsel), for appellants.

Clausen, Hirsh, Miller & Gorman, of Chicago (John P. Gorman, Stephen D. Marcus and James T. Ferrini, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

This appeal presents a situation in which able counsel on both sides of a controversy strive to apply divergent legal theories to a case in which the material facts are virtually admitted. The matter involves liability of Allstate Insurance Company (plaintiff) upon two policies of fire insurance covering a building and its contents in Springfield, Illinois. The action was brought for declaratory judgment. (Ill. Rev. Stat. 1973, ch. 110, par. 57.1.) The defendants originally were: National Tea Co. (National), lessee of the building and operator of a supermarket

therein; C. W. National Springfield, Ill., Inc. (C. W.), lessor and owner of the building; and also Franklin Life Insurance Company. The latter company, originally represented by separate counsel, owned a mortgage secured by the building. The parties in interest agreed that it has sustained no loss by virtue of the facts herein. It has not joined in this appeal. The two remaining parties defendant will be referred to collectively as "defendants."

After hearing the evidence, the trial court sustained plaintiff's position and declared the policies void and of no force and effect from their inception "by virtue of the lack of a meeting of the minds between the parties herein * * *." Defendants appeal.

Prior to the events in question here, National had placed all of its nonsprinklered stores, pertaining to both buildings and contents, under blanket policies provided by insurance companies other than plaintiff. For some years prior thereto, National had been assisted in its insurance problems by an insurance counsellor or broker (Oliver Wheeler) with 30 years of experience in this field. In a written stipulation of fact, the parties agreed that this broker acted as agent of defendants in dealing with Allstate to procure proper and sufficient fire insurance coverage.

National maintained insurance coverage on more than 500 supermarket locations. Obtaining this for buildings without sprinkler systems was difficult. Lengthy negotiations concerning a new program were held during 1968 and 1969 between representatives of the parties including an account executive for plaintiff (Walter Mulvihill), plaintiff's senior underwriter (Edwin Hoffman), National's insurance manager (Frank Femyer), defendants' broker and others. Plaintiff's representatives consistently took the position that they would not consider insurance on any nonsprinklered supermarket by itself and that they would consider placing the entire coverage on such properties only upon a retrospective premium formula together with a $100,000 deductible clause pertaining to each occurrence. On the contrary, policies would be issued upon an individual basis without these requirements for sprinklered locations. As a result of these negotiations, the conditions advanced by plaintiff became a firm understanding. In due course Allstate provided National with fire insurance on seven locations equipped with automatic sprinkler systems but did not write any insurance on supermarkets not thus equipped.

As regards the subject premises, 920 North Grand Avenue East, in Springfield, Illinois, defendants' broker called the senior underwriter of plaintiff during July of 1969 and stated that insurance was required upon a new store about to open. He did this at the specific request of National's insurance manager. The broker was asked by the underwriter

if this location was sprinklered and he replied affirmatively with the added statement that this was "a brand-new building." This information was confirmed by a written memorandum sent to the underwriter by the broker on July 5, 1969, which described the subject premises as a "Sprinklered (Brick) Bldg." In truth and in fact, the subject property was not provided with a sprinkler system. Two of National's agents, its real estate manager and its construction superintendent, were familiar with construction of the store upon the premises. They knew that it had no sprinkler system.

In due course, plaintiff issued two insurance policies in the usual form. One policy, issued to C.W., covered the building in the amount of $314,000 and sprinkler leakage on the building in the amount of $35,000. This policy had a typewritten endorsement, "It is understood and agreed, rates and premiums are tentative, subject to establishment of final rates by the Illinois Inspection and Rating Bureau." The other policy ran to National and covered contents in the amount of $400,000 and sprinkler leakage on the contents for $110,000. It contained a similar clause concerning rate adjustment. Both of these policies contained not only the sprinkler leakage coverage but also a provision requiring the insured, as a condition of the policy, to use due diligence to maintain the sprinkler system and water supply "in complete working order  *  *  *." These policies also gave plaintiff the right to cancel on 5 days' notice with or without cause.

The testimony of plaintiff's senior underwriter is clear and definite that, at the time of his telephone conversation with defendants' broker when the memorandum from the broker was received by him and when the policies dated July 5, 1969 were issued, he had no knowledge that the building in question was actually not provided with a sprinkler system. If he had such knowledge at that time, he would not have issued the policies. Similarly, the broker testified that he knew plaintiff would not write fire insurance on an individual basis on any property not provided with a sprinkler system and he knew the importance of his statements, verbal and written, that the premises in question were provided with a sprinkler system. The broker testified that the "pattern was such" that he believed the building had a sprinkler system.

These policies were received in due course by National's insurance manager who had 11 years of experience in his position. He read the policies and noticed that they contained sprinkler leakage insurance for buildings and contents. He noted also that they required the insured to keep the sprinkler system and water supply "in operation." He authorized payment of premiums on the policies. He was then aware that plaintiff would not accept a location without a sprinkler system. At that time, he

did not know that the subject premises had no sprinklers. The subject property, if nonsprinklered, would have had automatic coverage on blanket policies held by National but he requested that the broker obtain coverage from plaintiff.

On July 14, 1969, about 2 weeks after the effective date of the policies, the senior underwriter for plaintiff wrote a letter to the Chicago office of the Illinois Inspection and Rating Bureau, now known as Insurance Service Office of Illinois. This office is a corporation which establishes rates for fire and other related insurance upon commercial buildings based upon structural characteristics and other pertinent details. It has offices in Springfield and in Chicago. It establishes insurance rates on properties with and without automatic sprinkler systems. This service is rendered at the request of insurance companies, agents and brokers. These rates are based upon a detailed physical inspection of the property. Sprinklered and nonsprinklered buildings are handled in separate departments. There is, however, no separate department in Springfield, where the subject property is located, for handling properties with automatic sprinklers. After a rate has been set, the information is placed upon a rate card. All of these cards are retained together, without differentiation based upon the presence of a sprinkler system.

The Service Office is actually operated by a number of member insurance companies. These companies choose a governing committee which is analogous to a board of directors. However, an insurance company need not be a member of the organization but, as a so-called subscriber, it may obtain the same service. Plaintiff was a subscriber to the organization and had no vote or voice in its operation or procedure.

The letter from plaintiff to the Service Office properly and correctly gave the street address of the subject building. It described the property as "a new, sprinklered supermarket building." It requested inspection and rating. This request was brought to the attention of the assistant superintendent (Raymond Krause) of the Chicago department which dealt with sprinklered buildings. He has been associated with the organization for 25 years. Upon checking the files in his department, which pertained only to buildings equipped with sprinklers, he found a file for "902 South Grand Avenue" in Springfield. The file did not have a rate card thus indicating that the rate had not been established. In the file he found drawings for a sprinkler system being installed in a supermarket. He, therefore, on July 28, 1969, made a notation on the bottom of plaintiff's letter stating that the property would be scheduled for inspection and a rate established as soon as a certificate of completion from the contractor had been received. He retained a copy of the letter with this notation and assumed that he returned the original to plaintiff.

He "assumed" that he placed the copy in the file pertaining to "902 South Grand Avenue."

He next had this situation directed to his attention on October 3, 1969. At that time, as a second request for the rate information, plaintiff caused to be sent to the Service Office a copy of the previous letter dated July 14, 1969, with a rubber stamp "Second Request" and the current date of October 3, 1969. This copy was forwarded to the Service Office. However, by October 1, 1969, a rate card for the subject premises (920 North Grand Avenue East) was on file in the Service Office in Springfield. By coincidence, that office had received a request for a rate on these premises from another insurance company effective June 9, 1969. The Springfield office did inspect the subject property for this purpose on September 12, 1969, and prepared a rate card which it held in its files with a copy to the Service Office in Chicago. The rate indicates that the subject building had no sprinkler system.

However, the assistant manager of the Service Office in Chicago did not know of the existence of this rate card. Upon receiving the second written request from plaintiff, he again looked at the file concerning the sprinklered building at 902 Grand Avenue. Accordingly, on October 7, 1969, he sent plaintiff a handwritten note stating that his files showed a supermarket located at 902-906 South Grand Avenue and that "We feel this is the property in question." He stated that the rate information would be available in about 2 months.

This communication was received by plaintiff's senior underwriter. On October 15, 1969, he wrote another letter to the Service Office pointing out that there was apparently some confusion between the "two completely separate locations." Three days later the Chicago branch of the Service Office wrote to Springfield, enclosed copies of the previous correspondence, and requested that the situation be reviewed. Four days later (October 22, 1969) the Springfield office wrote to its Chicago branch and advised that there had been a complete loss on October 17, 1969, regarding the "*NON*sprinklered National Food Store at 920 North Grand East."

This information proved all too true. The building upon the subject property was destroyed by fire on October 17, 1969. On October 18, defendants' broker called plaintiff's account executive and told him that the property had been destroyed by fire. Both were surprised by the total loss of a building which both believed was equipped with a sprinkler system. Thus, even very soon after the loss, neither party was aware of this mutual mistake. It was not until October 20 or 21 that any employee of plaintiff was actually informed that the premises had

no sprinkler system. On October 24, 1969, plaintiff wrote to the defendants declining liability and tendering return of premiums. The letter stated that plaintiff had learned within the past week that there was no sprinkler system on the premises. The letter also stated that plaintiff would not have issued the policy if it had known that the property was not equipped with a sprinkler system. Defendants rejected the tender of premiums and the denial of liability.

It is also necessary to note that both policies contained the following provision:

> "This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto."

In this court, defendants urge that plaintiff cannot avoid the policies for a nonwilful misrepresentation because these policies expressly authorize avoidance only for a wilful misrepresentation. Alternatively, defendants contend that by delaying action until after the loss, plaintiff waived and became estopped to assert any right to void the policies. In this regard, defendants urge that the Service Office was plaintiff's agent and that this agent and the plaintiff had knowledge that the subject property did not have a sprinkler system. Defendants further urge that the files of the Service Office and the inspection of the property showed that the building had no sprinkler system and that plaintiff was charged with knowledge of these facts; and, accordingly, that plaintiff had constructive knowledge of facts which it should readily have learned by initiating an inquiry. Defendants finally contend that Allstate waived and is thus estopped to rely on any ground for forfeiture because of its delay and retention of prepaid premiums until after the fire.

In response, plaintiff takes the position that the pertinent facts are uncontradicted in that the minds of the parties did not meet so that no agreement was reached. In this regard, plaintiff contends that mutual mistake in a basic, underlying assumption is dispositive of defendants' claims. Plaintiff also contends that no agreement, and thus no contract, was reached and that without a meeting of the minds the right to rescind for this material matter need not be expressly reserved in the contract. Plaintiff urges that defendants themselves created the circumstances of which they now complain so that the arguments of waiver and estoppel are factually and legally untenable; the Service Office was not plaintiff's agent; plaintiff's authorization to the Service Office to establish rates has no bearing upon the failure of the parties to reach an agreement to

insure; waiver or estoppel cannot extend or create coverage where none exists; and, finally, there is no basis for the claim of waiver because defendants created their own predicament.

The plethora of authorities cited in the briefs is most convincing evidence of the wisdom of the supreme court rule describing this practice as "not favored." (Supreme Court Rule 341(e)(7), 50 Ill.2d R. 341(e) (7).) This is especially true in a situation as presented here where two sets of keen legal minds have each raised a valid issue of law. Our problem is in choosing which one of these disparate legal principles should properly be applied to the facts before us.

■■ The contention of defendants is placed squarely upon policy language. These policies provide that they shall be void if "the insured has wilfully concealed or misrepresented any material fact or circumstance * * *." As defendants point out, the Illinois Insurance Code provides that no "misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." (Ill. Rev. Stat. 1973, ch. 73, par. 766.) In *Campbell v. Prudential Insurance Co.*, 15 Ill.2d 308, 155 N.E.2d 9, the supreme court held that this statutory language must be construed with "or" as a disjunctive, in effect requiring a misrepresentation with intent to deceive, or, alternatively, one which materially affects the risk.

However, the policy provision here expressly requires wilful concealment or misrepresentation of a material fact as a prerequisite for avoidance of the policy. Defendants thus reason that the policy imposes a greater burden upon an insurer, such as plaintiff, who seeks to avoid it, than does the Insurance Code. Since we are dealing here with a standard form of fire policy, defendants contend that the proper authorities of the State of Illinois have purposefully caused the word "wilful" to be inserted into fire policies, including those here involved, and that this is the mandatory standard with which plaintiff must comply to avoid the policies here involved.

In this regard, defendants cite numerous authorities concerning the requirements placed upon insurers who wish to defend for breach of contract. This position is apparently legally sound, in conformity with clear policy language in the case before us. Defendants further urge that since the policies contain no express provision requiring the presence of a sprinkler system as a condition of validity, it follows necessarily that the absence of such sprinklers could not give rise to a right to avoid the policy without a wilful misrepresentation regarding their presence.

On the contrary, plaintiff takes the position that the decisive issue here does not depend upon the terms of the policy itself but the key

to the situation lies in the relationship between the parties prior to the issuance of the formal contract. It is plaintiff's theory that this is not a case involving fraud or misrepresentation but it is an action to rescind or avoid a contract because of a material mutual mistake made in connection with the subject matter so that the minds of the parties did not meet and thus a binding policy never actually came into legal existence.

There is ample authority to support this proposition. For example, in *Stricker v. Umbdenstock*, 200 Ill.App. 20, plaintiff ordered fire insurance on warehouse "A" from the insurer. The person who took the order in good faith placed the insurance on warehouse "D." Plaintiff brought suit against the agent who had taken the order for the insurance. This court reversed a judgment in favor of plaintiff on the theory "that there was no contractual relation between the parties—their minds never met. Plaintiff's mind was in warehouse 'A,' defendant's in warehouse 'D.'" 200 Ill.App. 20, 21.

In *Hoops v. Fitzgerald*, 204 Ill. 325, 68 N.E. 430, the parties proceeded upon the mistaken assumption that two additional stories could be added to a building which was to be the subject of a lease agreement between them. A covenant to that effect was included in the lease. It was later discovered that the original structure was too weak to support the proposed addition. The court held that the mutual mistake was material to the transaction and went to the heart thereof. It so affected the conduct of the parties that it prevented them from entering into a binding contract. The court therefore granted rescission.

In *Boyd v. Aetna Life Insurance Co.*, 310 Ill.App. 547, 35 N.E.2d 99, plaintiff obtained a policy of insurance upon the life of her husband including a provision for payment of permanent total disability. She and her husband separated. After some time, she surrendered the policy, unaware that prior thereto the insured had become permanently and totally disabled. Citing *Hoops*, the court held that there was a material mutual mistake which affected the substance of the transaction so that plaintiff had the right to rescind the cancellation of the policy.

In *Obartuch v. Security Mutual Life Insurance Co.* (7th Cir. 1940), 114 F.2d 873, a beneficiary sued upon two life insurance policies. The proof showed that the deceased insured neither signed nor authorized the execution of the application for the insurance. The district court held that no valid contract of insurance was ever brought into existence and recovery was denied. This result was affirmed in the court of appeals. The case is notable because of the holding by the court that the existence of an incontestable clause in the policy did not prevent proof that no contract had ever existed between the parties. As the court pointed out, the presence of the incontestable clause "presupposes a valid con-

tract and not one void ab initio—it cannot be used as a vehicle to sanctify that which never existed. \* \* \* Thus there was no meeting of the minds—a fundamental requisite of all contracts—the policies as issued were void and the incontestable clause without effect." 114 F.2d 873, 878.

Neither of the parties here denies that the contention advanced by the other may be true as a theoretical proposition. They differ sharply as to which of these propositions should be applied to the case before us. In our opinion, the evidence shows with total clarity that there was no wilful misrepresentation by defendants in connection with the placing of the insurance. Undoubtedly defendants and their individual agents were in complete good faith when they advised plaintiff that the subject premises did include a sprinkler system. When the broker, acting in behalf of defendants, represented verbally and in writing that the building included a sprinkler system, he had no knowledge to the contrary and was acting in a mistaken manner. Similarly, this erroneous information was accepted by plaintiff with complete good faith and acted upon in the same manner.

■■■ Thus, we have here a situation in which a mistake was made by one party and accepted by the other, both in good faith, with the result that the ensuing conduct of both parties was based upon a mutual mistake of fact. The evidence shows the materiality of this mistake. If defendants had not been mistaken, they would have known that the risk would be rejected by plaintiff. They knew that plaintiff would not accept an individual building without a sprinkler system and they knew that this type of structure should have been covered by their blanket policies then in existence. In precisely the same manner, if plaintiff had not been mistaken as to the central fact of existence of a sprinkler system, it would not have accepted the risk and issued the policies. It follows necessarily that the mistake thus made by one party, and perpetuated and acted upon by the other, was a mutual material mistake of fact which operated to prevent the existence of a valid contract.

■■ Nor does the question of diligence enter into the matter. This does not mean that parties to a transaction may close their eyes and act with complete lack of care. In the case before us, we cannot say that the evidence showed that either of these parties lacked reasonable diligence in the transaction of their business. It is true that either party could conceivably, by investigation or inquiry, have ascertained the facts. However, "it is not enough to prevent relief in case of a mutual mistake that the party complainant might, had he done all within his power, have ascertained the truth." (*Hoops v. Fitzgerald*, 204 Ill. 325, 330, 68 N.E. 430.) In our opinion, plaintiff had the right to rely upon the oral and written material representations made to it by the authorized

agent of defendants. It had no duty to exercise greater diligence than it did. It had no duty to attempt independent verification of the information thus provided by defendants. In fact, ascertainment of the true condition of the building was more readily available to defendants than it was to plaintiff.

We cannot accept the contention of defendants that plaintiff is strictly bound by the language of the contract so that it cannot obtain relief without proof of a wilful misrepresentation. The contention of plaintiff goes deeper than the terms or language of the contract itself and depends upon the ancient but potent principle of contract law that the formation of a binding contract is a matter of intent so that a valid contract can result only when there is a "meeting of the minds" of the respective parties. To hold otherwise would mean either that no contract could ever be rescinded for mutual mistake, or, alternatively, that no contract could be rescinded unless the parties so specifically provided in the agreement itself. It would seem manifestly impossible for parties to operate under a mutual mistake of fact but yet to provide against such a mistake by a specific contract provision.

It remains, however, to consider the alternative arguments advanced by defendants as to whether the relationship and dealings between these parties with reference to the activities of the Service Office and otherwise have created a defense based upon waiver or estoppel.

■■■ The classic definition of "waiver" is "the intentional relinquishment of a known right." (*Slavis v. Slavis*, 12 Ill.App.3d 467, 474, 299 N.E.2d 413, citing *Vermilion County Production Credit Association v. Izzard*, 111 Ill.App.2d 190, 195, 249 N.E.2d 352.) In the field of insurance law, waiver is generally "not expressed or intentional, but rather it is implied from the conduct of the insurer or its agents." (*Van Hulle v. State Farm Mutual Automobile Insurance Co.*, 44 Ill.2d 227, 230, 254 N.E.2d 457.) Waiver differs from estoppel in that the former considers only one's own conduct "without regard to its effect upon the party benefiting from the waiver." *National Bank v. Newberg*, 7 Ill.App.3d 859, 868, 289 N.E.2d 197.

■■■ Estoppel has been variously defined. The word may have reference "to a situation where, because of something which he has done or omitted to do, a party is denied the right to plead or prove an otherwise important fact." (*Jennings v. Bituminous Casualty Corp.*, 47 Ill. App.2d 243, 249, 197 N.E.2d 513.) Other definitions include in substance the concept of reliance by one party, to the extent of a change of position to his detriment in good faith, upon the conduct of the other as a result of which that other party will not be permitted to raise a contention inconsistent with his misleading conduct. (See *Hickey v. Illinois*

*Central R. R. Co.*, 35 Ill.2d 427, 447, 220 N.E.2d 415, cited in *Slavis v. Slavis*, 12 Ill.App.3d 467, 473.) In this regard, it has been stated that the party claiming the benefit of estoppel "must have relied upon the actions or representations of the other and must have had no knowledge or convenient means of knowing the true facts." *Levin v. Civil Service Com.*, 52 Ill.2d 516, 524, 288 N.E.2d 97; *Dill v. Widman*, 413 Ill. 448, 455, 456, 109 N.E.2d 765.

Since waiver, as used in insurance matters, can generally be described as implied rather than expressed, it may be more closely related to estoppel in such cases than in many other situations. In any event, determination of issues of estoppel must necessarily depend upon the facts of the specific case being considered. (*Forest v. Forest*, 9 Ill. App.3d 111, 115, 291 N.E.2d 880.) In all situations, the party who asserts the existence of estoppel "has the burden of proving it, and the proof must be clear, precise and unequivocal." *Jennings v. Bituminous Casualty Corp.*, 47 Ill.App.2d 243, 249, 197 N.E.2d 513.

The first question encountered here is whether the Service Office was the duly authorized agent of plaintiff in connection with the subject matter before us. Existence of an agency is initially a question of fact to be decided by the court or jury. (*Yuhas v. Allis-Chalmers Distribution Service Corp.*, 12 Ill.App.3d 814, 821, 822, 823, 299 N.E.2d 166.) It has been generally held that the test of agency is existence of the right to control the method or manner of the accomplishment of a task by the alleged agent. In differentiating between an agent and an independent contractor, the Supreme Court of Illinois held in *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 539, 176 N.E. 751, quoting from *Nelson Bros. & Co. v. Industrial Com.*, 330 Ill. 27, 161 N.E. 113, which in turn had quoted from *Decatur Ry. & Light Co. v. Industrial Board*, 276 Ill. 472, 114 N.E. 915:

> "The right to control the manner of doing the work is the principal consideration which determines whether the worker is an employee or an independent contractor."

In the case before us, plaintiff had no right to control the method or manner of performance of the task it had requested from the Service Office. Plaintiff was merely a subscriber to the Office, as distinguished from a member thereof. It had no voice in the management or operation of the office. Similarly, plaintiff neither exercised nor had the right to control the employees of the Service Office regarding the method or manner of inspection of the subject property. Plaintiff expected merely to be advised as to the premium rate to be applied to the policies in question.

It is true, as defendants urge, that the policies expressly contemplated

inspection of the property by the Service Office. However, it is clear from the language of the policies that this inspection was necessary for the establishment of final premium rates. The policies expressly provided that rates and premiums were tentative and subject to establishment of final rates by the Service Office. The function and authority of the Office were limited to this subject. Defendants had their own agents and employees who had a closer relationship to the subject property regarding the existence or absence of a sprinkler system than plaintiff or the Service Office. Thus, defendants had far greater opportunity, and even the duty, to determine this fact with complete accuracy.

Similarly, the policies provided that the Service Office was to be notified in event of any change in the sprinkler system. The use of this provision does not, in our opinion, establish an agency here but serves only to strengthen the fact that both parties to this controversy proceeded upon the basis of the mistaken and material notion that the subject property was improved with a sprinkler system.

It will be recalled that on October 1, 1969, a completed rate card for the subject property was in the possession of the Service Office at its Springfield and Chicago branches in connection with a request made by an insurance company other than plaintiff. However, the assistant manager of the Service Office, who was handling plaintiff's request for rate establishment upon the subject premises, had no actual knowledge of the existence of this information in his employer's files. The additional rate card was not made known by the Service Office to plaintiff at any time material to this litigation. In a situation of this type, without actual knowledge of the information on the rate card, no notice or knowledge thereof can be imputed to plaintiff. Not only does this record thus show complete lack of agency between plaintiff and the Service Office, it also shows that the additional card was obtained by the office as a result of a request made to it by a different insurance company for a separate transaction. Compare *Burton v. Perry*, 146 Ill. 71, 118, 119, 34 N.E. 60.

■■ Counsel for defendants raise a detailed argument concerning the dealings between plaintiff and the Service Office in this transaction. The point is raised that a number of mistakes were made by plaintiff and the Service Office in connection with the processing and handling of the request by plaintiff for rate establishment. It is not our function to pass upon the manner in which the Service Office handled the request. There is nothing in this course of dealings which demonstrates that mistakes were made by plaintiff in this regard. In the absence of proof of the existence of an agency relation between plaintiff and the Service Office, acts or omissions of the latter did not bind plaintiff, and notice to the office did not constitute notice to plaintiff. This entire course of dealings

between plaintiff and the Service Office would never have transpired were it not for the honest mistake made by defendants in submitting this risk to plaintiff in the guise of insurance upon a building equipped with a sprinkler system.

■■ It would seem to follow necessarily that the defense of waiver is not available. Certainly there was no express waiver of any kind by plaintiff nor was there any conduct by any agent of plaintiff which should be construed to constitute waiver by implication. On the contrary, this mistake was first made by defendants in good faith, and it was then adopted in the same good faith and perpetuated by plaintiff. We cannot gather intentional or knowing waiver of any rights by plaintiff, either expressly or by implication. As above shown, plaintiff had no actual knowledge of the absence of the sprinkler system until after the loss.

Defendants also press upon us the generally accepted proposition that "waiver of a forfeiture has been upheld under certain circumstances where the insurer, with knowledge of an intervening loss, accepts a premium tendered for the purpose of covering the loss." (*Van Hulle v. State Farm Mutual Automobile Insurance Co.*, 44 Ill.2d 227, 230, 254 N.E.2d 457.) In *Van Hulle*, as in other cases which apply this principle, the facts are quite different from the instant case. There, the proof showed a loss on the policy of which the company's agent had "immediate notice." The premium check was actually written before the loss and the insured advised the agent that, if there was to be no coverage, the check should be returned. This information was given to the company by the agent, yet the insurer deposited the check. Consequently the court found that there was a knowing waiver by the company.

Defendants further contend that an insurer and its agents cannot blindly rely on facts innocently misstated by an insured when the true facts are within easy reach of the insurer's agents. They claim that this principle is brought out in *Storment v. Hartford Fire Insurance Co.*, 215 Ill.App. 287. The court there dealt with a building in a small village. "[T]here was no other building of that kind or character in the village * * *." (215 Ill.App. 287, 292, 293.) The court therefore concluded that the insurer "could not have in fact been misled as to the building or its location." (215 Ill.App. 287, 293.) In the case before us, plaintiff was actually misled as to the material fact of the existence of a sprinkler system upon the premises. Plaintiff actually had no knowledge regarding this fact and no easy or convenient means of ascertaining it. Defendants, as owners and lessees of the property, certainly had far better means of knowing the situation regarding this fact. Yet, they were mis-

taken, and by their conduct they innocently caused existence of the same mistaken idea to be planted in the minds of plaintiff's agents.

As regards the issue of estoppel, the same conclusion must necessarily be reached. None of the elements of estoppel appear to be presented by this record. There is no reliance by defendants upon conduct of plaintiff. Each and every act performed by plaintiff, including issuance of the policies and plaintiff's very failure to take steps to rectify the situation, is patently and completely based upon the same mistaken belief that activated the agents of defendants when they made their mistaken verbal and written representations to plaintiff regarding existence of the sprinkler system. We find here no change of position by defendants to their detriment caused by any act or failure to act by plaintiff. On the contrary, the unfortunate result here reached had its origin in the mistake made in good faith by defendants' own people.

■■ We cannot accept the argument so skillfully advanced by the defendants that delay by plaintiff caused the loss. As shown, the fact of nonexistence of the sprinkler system should have been known and could have been ascertained with at least equal or perhaps better ease and facility by defendants than by plaintiff. Then, armed with this information, mere inaction by defendants would have resulted in coverage of the building and contents by their existing blanket insurance policy. Therefore, we reject the contention of defendants that delay in inspection of the premises by the Service Office is sufficient basis upon which to predicate estoppel of plaintiff. Aside from the most important fact that no agency existed between plaintiff and the Service Office, the record does not justify the statement that such delay "prevented" defendants from obtaining coverage under substitute insurance. The lack of this type of coverage is not traceable to any conduct or even to any inaction or delay by plaintiff or by the Service Office. On the contrary, reliance upon substitute insurance coverage was discarded intentionally by defendants as a result of their own initial mistake regarding a physical fact concerning property which they themselves owned and leased.

Nor can we accept the contention of defendants that delay or silence by an insurer constitutes waiver or estoppel when there has been an intervening loss. We have already noted that *Van Hulle v. State Farm Mutual Automobile Insurance Co.*, 44 Ill.2d 227, 254 N.E.2d 457, cited for this point by defendants, is not applicable here. In the same classification are cases such as *Reinhardt v. Security Insurance Co.*, 312 Ill.App. 1, 38 N.E.2d 310. The court there found a waiver by implication regarding an increase in hazard in fire insurance due to a change in occupancy and use of the property. This was predicated upon the general proposi-

tion that the company had "knowledge of the breach, through its agent * * *," (312 Ill.App. 1, 12) but still remained silent and retained the premium. The lack of agency and also the lack of delay after ascertainment of knowledge by plaintiff in the case at bar render that decision also inapplicable.

As we have already pointed out, both sides of the controversy have made elaborate contentions in support of their respective positions. Both sides have cited so many authorities that it would be impossible to consider each of them in any opinion of reasonable length. Upon the above analysis we conclude that the defenses of waiver and estoppel are not available to defendants, and their alternative argument therefore fails.

Generally speaking, it should finally be noted that the alternative arguments thus advanced by defendants deal with the issue of attempted avoidance of a completed and binding contract of insurance. Plaintiff's position is far deeper and convinces us that mutual material mistake motivated this entire transaction so that no binding agreement was ever actually entered into between these parties.

In our opinion, the judgment of the trial court in avoiding the policies is in accordance with the facts and the law and should be and is affirmed.

Judgment affirmed.

BURKE, P. J., and EGAN, J., concur.