THIRD DIVISION
December 12, 2007

No. 1-06-2398

| | | |
|---|---|---|
| MICHAEL JORDAN, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff and Counterdefendant-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 05 CH 13060 |
| | ) | |
| KARLA KNAFEL, | ) | Honorable |
| | ) | Stuart E. Palmer, |
| Defendant and Counterplaintiff-Appellant. | ) | Judge Presiding. |

_____JUSTICE THEIS delivered the opinion of the court:

This action arises from a complaint for declaratory judgment originally filed by plaintiff

Michael Jordan alleging that defendant Karla Knafel was attempting to extort $5 million from him

by threatening to publicly expose their relationship. Knafel filed a counterclaim asserting breach

of contract based on Jordan's alleged agreement to pay her $5 million when he retired from

basketball in exchange for her agreement not to file a paternity suit against him and to keep their

romantic involvement confidential. Ultimately, Jordan filed a motion for summary judgment on

Knafel's counterclaim and on his amended complaint. The circuit court granted the motions for

summary judgment, finding that the alleged settlement agreement was unenforceable because it

would have been either fraudulently induced by Knafel's false statement to Jordan that "she was

pregnant with his child" or would have been based on a mutual mistake of fact as to the paternity

of her unborn child.

On appeal, Knafel contends that the circuit court erred in granting Jordan's motions for summary judgment on her verified counterclaim and his amended complaint where: (1) material issues of fact remain regarding the validity of the paternity tests; (2) material issues of fact remain on the elements of good faith, intent, materiality, and reliance in connection with Jordan's defenses of fraudulent inducement and mutual mistake of fact; and (3) there was no evidence that she ever threatened Jordan to substantiate his claim of extortion. Additionally, Knafel contends that the circuit court abused its discretion in denying her motions to compel Jordan's deposition and the production of certain documents.

BACKGROUND

On October 23, 2002, Jordan filed his original complaint for a declaratory judgment and injunctive relief against Knafel. Therein, he alleged that he had a relationship with Knafel more than a decade earlier, but denied the existence of any agreement to pay Knafel $5 million. Jordan further alleged that Knafel had previously extorted $250,000 from him under threat of publicly exposing their relationship and that, pursuant to a purported second agreement, she threatened to publicly expose their relationship unless Jordan paid her an additional $5 million. He sought a declaratory judgment that her demand for payment, even if an agreement existed, was unenforceable because (1) extortionate agreements violate public policy; (2) there would be no consideration to support any such agreement due to Knafel's existing obligation not to publicly expose their relationship; (3) any such agreement would violate the statute of frauds; and (4) any such agreement would be barred by the statute of limitations. Additionally, Jordan sought an

order enjoining Knafel, and any other person acting on her behalf, from engaging in further efforts to extort money from him.

Knafel responded to the complaint by filing a verified answer and affirmative defenses denying the material allegations of the complaint. Therein, she admitted that Jordan paid her $250,000 but stated that it was for her mental pain and anguish arising from their romantic relationship. In addition, Knafel filed a verified counterclaim asserting theories of breach of contract and anticipatory breach of contract based on Jordan's alleged breach of his promise to pay Knafel $5 million "when he retired from professional basketball in exchange for her agreement not to file a paternity suit against him and for her agreement to keep their romantic involvement publicly confidential."

The following relevant facts were alleged in the verified counterclaim. In the spring of 1989, Knafel, a singer, was performing in a band at a hotel in Indianapolis, Indiana. The Chicago Bulls were also in town to play the Indiana Pacers. After her performance, Knafel was approached by a National Basketball Association referee, who eventually introduced her to Jordan over the telephone. Although Knafel declined Jordan's invitations to meet during the spring and summer of 1989, she and Jordan continued long-distance telephone conversations during that time.

In December 1989, three months after Jordan had married his wife, Knafel traveled to Chicago to meet Jordan, where they had unprotected sex. Thereafter, in November 1990, Knafel stayed with Jordan in Phoenix, Arizona, where they again had unprotected sex. In early 1991, Knafel learned that she was pregnant. She "was convinced that she was carrying Jordan's baby,"

but kept silent about the pregnancy for some time. The Bulls were on their way to their first NBA championship and Jordan was earning large sums of money in product endorsements. Knafel alleged that as a result, Jordan was "troubled" when she told him "she was pregnant with his child" in the spring of 1991. He was worried about destroying his public image, which he and his agent had carefully cultivated, and was concerned about the loss of future endorsements. Knafel further alleged that Jordan demanded that she abort the baby, but because of her personal beliefs, she refused.

According to Knafel, during several conversations about the impending birth of the baby, she and Jordan "discussed possible resolutions of their dilemma." In the spring of 1991, Jordan offered, and urged Knafel to accept, his proposed settlement agreement to "resolve their problems." Jordan offered to pay her "$5 million when he retired from professional basketball in return for her agreement not to file a paternity suit against him and for her agreement to keep their romantic involvement publicly confidential." Knafel accepted Jordan's offer. In consideration for his promise to pay her, she agreed to forbear filing a public paternity action against him and agreed to keep their romantic relationship confidential.

In July 1991, Knafel's child was born. Jordan paid certain hospital bills and medical costs and paid Knafel $250,000 for "her mental pain and anguish arising from her relationship with him." Knafel did not file a paternity suit against Jordan and she kept their relationship confidential.

Thereafter, in October 1993, Jordan announced his retirement from the Bulls, but in March of 1995, he returned again to the NBA to play for the Bulls. Knafel had not contacted

Jordan to demand her payment of the $5 million which he had allegedly promised her until the summer of 1998, amid public speculation that Jordan would soon retire again. In September 1998, Knafel approached Jordan while he was vacationing in Las Vegas. During their conversation, Knafel reminded Jordan of his obligation to pay her the money under their agreement. Knafel alleged that Jordan reaffirmed his agreement to pay her the $5 million. A few months later, Jordan again retired from professional basketball.

Two years later, after Jordan failed to pay the $5 million under the alleged agreement, Knafel's counsel contacted Jordan's counsel to resolve their contract dispute. Jordan denied that he had promised to pay Knafel $5 million and eventually filed his complaint for declaratory judgment and an injunction. Knafel's counterclaim sought $5 million for breach of contract. Additionally, at the time Knafel filed her counterclaim, it was alleged that Jordan was playing basketball for the Washington Wizards. Accordingly, she also alleged an anticipatory breach of their 1991 contract and 1998 reaffirmation.

Thereafter, Jordan filed a hybrid motion for judgment on the pleadings, which was directed to his complaint, and a motion to dismiss Knafel's counterclaim. Therein, Jordan argued that the alleged agreement was unenforceable because it violated public policy or, in the alternative, that it was induced by fraud or mutual mistake of fact regarding the paternity of her child.

After a separate hearing on both motions, the trial court dismissed Jordan's complaint for declaratory judgment and denied his motion for judgment on the pleadings. The court found that Jordan failed to allege an actual controversy and that issuing a declaratory judgment on a

hypothetical contract would constitute the rendering of an advisory opinion. The trial court further dismissed the counterclaim, finding the agreement to be extortionate and against public policy. The parties appealed both rulings.

In Jordan v. Knafel, 355 Ill. App. 3d 534, 542, 823 N.E.2d 1113, 1121 (2005), this court reversed the circuit court's dismissal of the counterclaim, holding that taking the pleadings as alleged, "the agreement could be construed as a good-faith settlement of her paternity claim with a confidentiality provision which is not violative of public policy." Jordan, 355 Ill. App. 3d at 542, 823 N.E.2d at 1121. Additionally, this court held that it could not address the merits of the fraudulent inducement and mutual mistake arguments because there was no proper evidence presented to the court with which to conclude that Jordan was not the father of the child. Jordan, 355 Ill. App. 3d at 544, 823 N.E.2d at 1122. Finally, this court reversed the dismissal of Jordan's complaint and held that although on its face it lacked sufficient facts to state a cause of action, the facts alleged in Knafel's counterclaim were sufficient to form a record establishing an actual controversy. Jordan, 355 Ill. App. 3d at 545, 823 N.E.2d at 1123.

On remand, Jordan filed a verified amended complaint for declaratory judgment and injunctive relief and a motion for summary judgment on Knafel's counterclaims. For purposes of the motion for summary judgment, Jordan did not contest the existence of the alleged settlement agreement. Rather, he argued that the alleged agreement was unenforceable because it was either fraudulently induced or was based on a mutual mistake of fact as to the paternity of Knafel's child. In support, Jordan attached the affidavit of Dr. Charles M. Strom. Dr. Strom's affidavit provided that in August 1991, which was one month after Knafel's child was born, and a few

6

months after the purported settlement agreement, he collected blood samples from Jordan, Knafel, and Knafel's child, and conducted genetic testing for all three individuals under pseudonyms. Based upon the lab report from the Genetics Institute of the Illinois Masonic Medical Center, which was attached to Dr. Strom's affidavit, Dr. Strom concluded that "[t]he test exclude[d] Mr. Jordan from being the father" of Knafel's child. Additionally, in September 1991, Dr. Strom collected blood samples from Jordan to conduct additional genetic testing of Jordan, Knafel, and her child. Those tests were conducted by Cellmark Diagnostics and the report, also attached to the affidavit, indicated that Jordan was excluded from being the father of Knafel's child by both DNA and serology testing.

In response, Knafel argued that Jordan's actual paternity was irrelevant to the enforceability of the alleged settlement agreement. In support of her argument, she filed an affidavit in opposition to the motion for summary judgment. Therein, she stated that at the time of the alleged agreement she believed in good faith that she was pregnant with Jordan's child. Specifically, she stated that she informed Jordan throughout their relationship that she was having sex with another man and that he even teased her about it. She never told Jordan that she was using birth control and he never used a condom when they had sex. She and Jordan were together in Phoenix, Arizona, on November 19-20, 1990, when they had unprotected sex. On February 14, 1991, her obstetrician, Dr. Michael F. Grisanti, told her that her baby was conceived on November 19 or 20, 1990. Knafel attached to her affidavit a copy of Dr. Grisanti's signed and dated office note. The note provides as follows:

"TO WHOM IT MAY CONCERN:

> KARLA KNAFEL IS A PATIENT UNDER MY CARE FOR HER
> PREGNANCY. HER DATE OF CONCEPTION IS NOV. 19, 20,
> 1990. HER LMP WAS NOV. 5, 1990. HER EDC IS AUG. 10,
> 1991. ANY QUESTIONS PLEASE FEEL FREE TO CALLME
> [*SIC*] AT MY OFFICE."

Knafel alleged that since those dates coincided with her stay with Jordan in Phoenix, she believed in good faith that she was pregnant with Jordan's child. Ultimately, Knafel's child was born in July 1991.

Additionally, in response to Jordan's motion for summary judgment, Knafel disputed the validity and reliability of the paternity tests submitted by Jordan and sought to compel discovery from him, but declined to depose Dr. Strom and declined Jordan's offer of additional paternity testing.

After a hearing, the trial court granted Jordan's motion for summary judgment on the counterclaim, finding that "as a result of Knafel's fraudulent misrepresentation to Jordan that he was the child's father or, alternatively, as a result of a mutual mistake of fact, the alleged settlement contract is voidable and is therefore unenforceable against Jordan." Thereafter, the trial court also granted Jordan's motion for summary judgment on his amended complaint for declaratory judgment, concluding that "the relief sought in [Jordan's] declaratory judgment is the same relief" granted in the motion for summary judgment on the counterclaim. Knafel's motions to compel discovery were also denied. Knafel filed a timely appeal from those orders.

ANALYSIS

Knafel contends on appeal that the circuit court erred in granting Jordan's motions for summary judgment where there were disputed issues of fact relating to his defenses of fraudulent inducement and mutual mistake of fact. Summary judgment is proper where the pleadings, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2004).

"The movant bears the initial burden of production in a motion for summary judgment." Bourgonje v. Machev, 362 Ill. App. 3d 984, 994, 841 N.E.2d 96, 106 (2005). "A defendant moving for summary judgment may meet its burden of production either by presenting evidence that, left unrebutted, would entitle it to judgment as a matter of law or by demonstrating that the plaintiff will be unable to prove an element of its cause of action." Bourgonje, 362 Ill. App. 3d at 994, 841 N.E.2d at 106. If a defendant presents facts that would demonstrate its entitlement to judgment as a matter of law, the burden then shifts to the plaintiff to present some evidence allowing the imposition of liability on the defendant and supporting each element of his cause of action, thereby defining a material issue of fact to be determined at trial. Bourgonje, 362 Ill. App. 3d at 994-95, 841 N.E.2d at 106. Thus, although a plaintiff need not prove his case during a summary judgment proceeding, he must present some evidence to support each element of the cause of action. Prostran v. City of Chicago, 349 Ill. App. 3d 81, 85, 811 N.E.2d 364, 367 (2004). Our standard of review is *de novo*. Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 216 Ill. 2d 294, 305, 837 N.E.2d 99, 106 (2005).

Initially, we address Knafel's threshold assertion that there is a disputed issue of fact regarding Jordan's paternity. Although rejecting several opportunities to depose Dr. Strom and to conduct additional paternity testing, Knafel instead claims that she is entitled to an inference that Dr. Strom's expert opinion is invalid or unreliable. She makes the following arguments: (1) the tests performed by the Genetics Institute were spoiled or tainted as a result of refrigeration; (2) the Genetics Institute test results are inadmissible hearsay where Dr. Strom did not personally conduct these tests; (3) no chain of custody has been shown to prove that the blood samples drawn actually came from Jordan; and (4) Dr. Strom cannot verify the authenticity of the Cellmark testing.

We find that Dr. Strom's affidavit and attached test results constitute valid and admissible evidence in support of Jordan's motion for summary judgment. Contrary to Knafel's assertions, the Genetics Institute final results were not spoiled or tainted. Rather, Dr. Strom indicated that due to inadvertent refrigeration of certain samples, definitive HLA serology testing could not be completed. However, despite the refrigeration issue, he was able to conclude that Jordan was not the father of Knafel's child because Jordan "was excluded from paternity by 4 other serology tests which are not sensitive to refrigeration, and by DNA testing." This conclusion was further supported by the subsequent Cellmark DNA and serology testing.

Furthermore, we reject Knafel's argument, made without citation to any relevant authority, that the test results are inadmissable hearsay because Dr. Strom does not claim to have done the testing himself. Indeed, Dr. Strom indicated in his affidavit that with respect to the Genetics Institute tests, he "conducted genetic testing," and the test results are signed by him.

10

Knafel was free to test that assertion by deposing Dr. Strom, but she declined. With respect to the Cellmark test results, although Knafel argues that Dr. Strom cannot verify their authenticity, as an expert witness, Dr. Strom may rely on otherwise inadmissible facts or data to support his opinion that Jordan is not the father of Knafel's child. Wilson v. Clark, 84 Ill. 2d 186, 192-93, 417 N.E.2d 1322, 1326 (1981).

Additionally, Knafel's arguments regarding chain of custody and authenticity are mere speculation and are unsupported by any evidence suggesting that the tests were actually tainted or contaminated. Mere speculation is not enough to create a genuine issue of material fact sufficient to survive a motion for summary judgment. Tzakis v. Dominick's Finer Foods, Inc., 356 Ill. App. 3d 740, 747, 826 N.E.2d 987, 994 (2005). As the trial court aptly stated, "[t]his Court will not hear Knafel's unsupported challenge to the paternity tests when the Court's offer of yet a third round of testing was rebuffed by Knafel's counsel." Accordingly, where Jordan has presented unrebutted evidence regarding paternity, Knafel has failed to meet her burden to raise a genuine issue of material fact regarding Dr. Strom's findings.

We must now consider what impact the paternity evidence has on the enforceability of the alleged agreement. Knafel argues that Jordan's actual paternity is irrelevant to the enforceability of the alleged settlement agreement as long as she has alleged a good-faith belief at the time of contracting that she was pregnant with Jordan's child. Jordan maintains that, based upon the uncontroverted evidence that he is not the father of Knafel's child, her statement to him at the time of the alleged settlement that "she was pregnant with his child" is a fraudulent misrepresentation as a matter of law which makes the contract voidable, permitting rescission.

11

1-06-2398

A contract may contain all of the elements necessary for enforceability, but may nonetheless be unenforceable as a result of the imposition of an affirmative defense. R. Lord, Williston on Contracts §69:1, at 485 (4th ed. 2003). Here, Jordan seeks rescission of the contract, which is an equitable doctrine (Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co., 355 Ill. App. 3d 156, 165, 821 N.E.2d 706, 713 (2004)), based on the affirmative defense of fraud in the inducement. Fraud in the inducement of a contract is a defense that renders the contract voidable at the election of the injured party. Tower Investors, LLC v. 111 East Chestnut Consultants, Inc., 371 Ill. App. 3d 1019, 1030, 864 N.E.2d 927, 939 (2007).

In order for a representation to constitute fraud that would permit a court to set aside a contract, the party seeking such relief must establish that the representation was: (1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; and (4) was relied upon by the other party to his detriment. Tower Investors, LLC, 371 Ill. App. 3d at 1030, 864 N.E.2d at 939; Wilkinson v. Appleton, 28 Ill. 2d 184, 187, 190 N.E.2d 727, 729-30 (1963).

Knafel asserts that there is a genuine issue of fact as to whether her affirmative representation to Jordan that "she was pregnant with his child" was material to the alleged settlement agreement and induced Jordan to act. Specifically, she argues that Jordan's actual paternity (1) was not a subject of discussion when they reached their settlement agreement; (2) it was not a term or contingent condition of their settlement agreement; and (3) Jordan has never actually stated that it was material to the agreement. Additionally, she maintains that she is

12

entitled to an inference that Jordan's only motive was to preserve his image and protect his lucrative endorsements.

A misrepresentation is "material" if the party seeking rescission would have acted differently had he been aware of the fact or if it concerned the type of information upon which he would be expected to rely when making his decision to act. Miller v. William Chevrolet/GEO, Inc., 326 Ill. App. 3d 642, 649, 762 N.E.2d 1, 7 (2001); see also Restatement (Second) of Contracts §162(2) (1981) (materiality exists when the misrepresentation would be likely to affect the conduct of a reasonable person). To be material, the representation need not have been the "paramount or decisive inducement, so long as it was a substantial factor." R. Lord, Williston on Contracts §69:12, at 550-51 (4th ed. 2003); see Restatement (Second) of Contracts §167, at 453 (1981) ("a misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent").

Contrary to Knafel's assertions, her own allegations establish that paternity was material to the alleged settlement agreement and was made for the purposes of inducing Jordan to act. Knafel alleged that in the spring of 1991, when she told Jordan "she was pregnant with his child," Jordan "became worried" and they "discussed possible resolutions of their dilemma." When she refused to get an abortion, Jordan then "proposed a settlement agreement which would resolve their problems." In her verified statement, she asserted that it was not until "after [she] told Jordan of [her] pregnancy" that "Jordan said he was troubled at the prospect of destroying his public image" and he agreed to the alleged settlement. Thus, although a general fear of public exposure of their relationship may well have been a factor when Jordan proposed the alleged

13

settlement, it was not Jordan's only inducement. Rather, by Knafel's own account, her statement to Jordan that he was the father of her child was indeed material and a substantial factor in inducing Jordan to act.

To hold otherwise would render her agreement not to file a paternity claim to have been a mere pretense to extort money. If Jordan's paternity was immaterial to the parties' settlement agreement, then her claim that she had a good-faith basis for a paternity action against Jordan would be unfounded. Without a good-faith basis, they would have lacked the necessary consideration for their bargain. See McKinley v. Watkins, 13 Ill. 140, 143-44 (1851). Since consideration is a material element of a contract (Steinberg v. Chicago Medical School, 69 Ill. 2d 320, 371 N.E.2d 634 (1977)), Jordan's paternity must have been material to a good-faith settlement of her paternity claim.

Next, we consider whether there is a genuine issue of fact as to whether Knafel's representation was known to be false or not reasonably believed by her to be true at the time of the alleged agreement. Jordan argues that because Knafel represented to him with certainty that "she was pregnant with his child," yet paternity testing ultimately revealed that someone else was the father, it necessarily follows that at the time she told Jordan he was the father, she must have lacked certainty about the paternity of the child. Therefore, Knafel's knowledge of her uncertainty regarding paternity satisfies the "knowledge" element of fraudulent misrepresentation. He relies upon Lipscomb v. Wells, 326 Ill. App. 3d 760, 761 N.E.2d 218 (2001), and section 162(1) of the Restatement (Second) of Contracts in support (Restatement (Second) of Contracts §162(1) (1981)).

14

In Lipscomb, the plaintiff brought a paternity action against the defendant to have him adjudicated the father of her child, alleging in a verified complaint that he was the natural father. Lipscomb, 326 Ill. App. 3d at 762, 761 N.E.2d at 219. Thereafter, an agreed order of parentage was entered requiring the defendant to pay child support. Years later, after being told by the plaintiff that he was not the child's natural father and that she had been seeing another man at the time of conception, the defendant filed a petition seeking DNA testing to determine his paternity and to vacate the agreed order and to refund the child support payments. Lipscomb, 326 Ill. App. 3d at 762, 761 N.E.2d at 219-20. Therein, he asserted that he entered into the parentage agreement without the benefit of DNA testing based upon a representation from the plaintiff that he was the natural father of the child and a representation that she "had no other relations with men at the time of conception." Lipscomb, 326 Ill. App. 3d at 762, 761 N.E.2d at 219. The trial court vacated the parentage judgment finding that prior to the entry of the agreed order of paternity, the plaintiff concealed from defendant the material fact that he was not the child's father. Lipscomb, 326 Ill. App. 3d at 763, 761 N.E.2d at 220.

On appeal, the appellate court affirmed, recognizing generally that concealing the paternity of a child from a man held liable for paternity of that child is fraud. Lipscomb, 326 Ill. App. 3d at 765-66, 761 N.E.2d at 222. The court reasoned that when a party claims to know a material fact with certainty, yet knows that she does not have that certainty, the assertion constitutes a fraudulent misrepresentation. Lipscomb, 326 Ill. App. 3d at 768, 761 N.E.2d at 224. Thus, the court reasoned, as applied to this context, when a woman categorically represents to a man that he is the father of her child, it is implicit in her representation that during the period of conception

15

she had only one sexual partner. If the man is actually not the father, that representation is categorically false, and constitutes a fraudulent misrepresentation. Lipscomb, 326 Ill. App. 3d at 768, 761 N.E.2d at 224.

Although Lipscomb does not specifically rely on section 162(1) (Restatement (Second) of Contracts §162(1) (1981)) to support its reasoning, it is implicitly recognized therein. That provision is instructive and provides:

> "(1) A misrepresentation is fraudulent if the maker intends
>
> his assertion to induce a party to manifest his assent and the
>
> maker
>
>> (a) knows or believes that the assertion is not in
>>
>> accord with the facts, or
>>
>> (b) does not have the confidence that he states or
>>
>> implies in the truth of the assertion, or
>>
>> (c) knows that he does not have the basis that he
>>
>> states or implies for the assertion." Restatement
>>
>> (Second) of Contracts §162(1) (1981).

Here, at the time of contract formation, Knafel represented with certainty that she knew Jordan was the father of her child. However, the paternity tests reveal that it was also the case that she was having sexual relations with someone other than Jordan around the time of conception. Therefore, the evidence presented establishes that she knew that she lacked the certainty about the paternity of the child or, at least, knew that she did not have the basis that she

stated or implied for that categorical representation, thus making it fraudulent.

To rebut that finding, Knafel asserts that she believed she had certainty about the paternity of her child, and in support of that state of mind, she relies on Dr. Grisanti's office memo regarding the timing of conception. However, the memo is insufficient to defeat summary judgment. Knafel merely states that the doctor's information regarding the dates of conception coincided with the dates she was with Jordan in Phoenix. That assertion does not discount that she knew she was also with another partner around that same time period. Although one could contemplate a situation where a pregnant woman could be subjectively certain about paternity, Knafel has presented no such affirmative evidence to support an adequate basis for her certainty.

Additionally, Knafel argues that she indeed disclosed to Jordan throughout their relationship that she was having sex with another man. Nevertheless, the question is not whether she told him about her relationships with other men at some previous time, but whether she failed to disclose material information in the process of contract formation that would render the contract voidable. Section 161(b) (Restatement (Second) of Contracts §161(b) (1981)) is instructive here, providing that one makes a misrepresentation through nondisclosure:

> "(b) Where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Restatement (Second) of Contracts §161(b) (1981).

17

1-06-2398

Here, at the time of negotiating the settlement, Knafel was not forthcoming that she had sex with another partner at the time of conception. Instead, she made an affirmative representation with certainty that she was pregnant with Jordan's child. Her failure to disclose the information when she alone had access to that information amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

Finally, with respect to the element of reliance, Knafel initially argues that Jordan's failure to state that he relied upon Knafel's representation precludes summary judgment. However, "[w]here representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, it will be presumed that the representations were relied on." R. Lord, Williston on Contracts §69:32, at 12 (4th ed. 2003), citing Hicks v. Stevens, 121 Ill. 186, 11 N.E. 241 (1887). Knafel argues that Jordan's statements to her in 1998, that he remembered their agreement and would still pay her, despite his knowledge that he was not the child's father, supports an inference that, at the time he entered into the contract, he never relied on her representation that he was the father of the child. However, as stated previously, if the alleged agreement had nothing to do with his paternity, then the agreement was merely an agreement to keep their romantic relationship confidential and could no longer be construed as a settlement of her paternity claim with a confidentiality provision. Accordingly, based upon Knafel's own allegations, Jordan must have relied on the representation or the alleged settlement agreement was otherwise untenable.

Furthermore, as the court in Lipscomb articulated, Jordan had a right to rely upon the categorical representation by Knafel that he was the father because "[i]t would make little sense to

18

compel a putative father to conduct an independent investigation in the face of a clear and categorical representation of a mother (who is also his sexual partner) as to his parentage." Lipscomb, 326 Ill. App. 3d at 768, 761 N.E.2d at 224. Additionally, we find no merit to Knafel's contention that Jordan should not have relied on the representation. " ' "[O]ne who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in so doing" [citations.]' " Lipscomb, 326 Ill. App. 3d at 768-69, 761 N.E.2d at 224, quoting Arndt v. Arndt, 336 Ill. App. 3d 65, 76, 82 N.E.2d 908, 913 (1948). Accordingly, for all of the foregoing reasons, the alleged settlement agreement was premised on a fraudulent misrepresentation and, therefore, was voidable by Jordan.

We further find Knafel's cited cases, primarily a Maryland case from 1956 and an Illinois case from 1880, to lack any persuasive or instructive value where contract law has evolved and societal notions regarding intimate relationships have changed. Moreover, Heaps v. Dunham, 95 Ill. 583 (1880), and Fiege v. Boehm, 210 Md. 352, 123 A.2d 316 (1956), merely stand for the unremarkable proposition already recognized by this court that forbearance to sue for a lawful claim or demand is sufficient consideration for a promise to pay for the forbearance "if the party forbearing had an honest intention to prosecute litigation which is not frivolous, vexatious, or unlawful, and which he believed to be well founded." Fiege, 210 Md. at 361, 123 A.2d at 322.

The court in Fiege found that even though Fiege was ultimately found not to be the father there was no proof of fraud or unfairness and that the mother gave testimony which indicated that "she made the charge of bastardy against [the father] in good faith." Fiege, 210 Md. at 362, 123

19

A.2d at 323. The court in Heaps affirmed a settlement of a bastardy claim, finding no fraud despite evidence that there was doubt whether the woman was actually pregnant. Heaps, 95 Ill. at 585. Nevertheless, the court recognized that the settlement of a bastardy claim could be avoided by the putative father where the settlement was procured by fraud. Heaps, 95 Ill. at 586; see also Fiege, 210 Md. at 361, 123 A.2d at 322.

Moreover, under modern case law and section 161(Restatement (Second) of Contracts §161 (1981)), the mother's testimony in Fiege that she had sex with the defendant on one occasion, would likely constitute a misrepresentation permitting rescission where she failed to disclose the material fact that she also had sex with another partner around the time of conception. See Oberman, Sex, Lies, and the Duty to Disclose, 47 Ariz. L. Rev. 871 (2005) (arguing in favor of subjecting these types of agreements between intimates to contemporary rules favoring disclosure of material information). Accordingly, Knafel's reliance on these cases is not well founded.

Alternatively, we consider Jordan's defense of mutual mistake of fact. "Mutual mistake of fact" as defined by section 152 of the Restatement (Restatement (Second) of Contracts §152 (1981)), and as recognized in Bentley v. Slavik, 663 F. Supp. 736 (S.D. Ill. 1987) citing Hagenbuch v. Chapin, 149 Ill. App. 3d 572, 500 N.E.2d 987 (1986), provides that if a mistake by both parties "as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake." Restatement (Second) of Contracts §152, at 385 (1981).

Here, even if Knafel's representation was not fraudulent and was made in good faith, her

representation regarding paternity was ultimately mistaken as Jordan was not the father of the child. As we have already held, the issue of paternity went to a basic assumption upon which the contract was made because it was the consideration for the alleged settlement of her paternity claim. Knafel's certainty regarding Jordan's paternity had a material effect on the agreed exchange of performances, and Jordan did not bear the risk of mistake as a matter of law as he was not obligated to infer that Knafel had another sexual partner at the time of conception in the face of Knafel's categorical representation that Jordan was the father. See Lipscomb, 326 Ill. App. 3d at 768. In other words, Jordan had no duty to attempt independent verification of the information especially where, here, ascertainment of the true fact was more readily available to Knafel than it was to Jordan. See Allstate Insurance Co. v. National Tea Co., 25 Ill. App. 3d 449, 461, 323 N.E.2d 521, 529 (1975) (party had no duty to attempt independent verification of representation that building had sprinkler system especially where true condition of the building was more readily ascertainable to the other party). Accordingly, Jordan is entitled to rescission based upon a mutual mistake of fact regarding paternity and summary judgment was properly granted in his favor on that basis.

Next, we consider Knafel's argument that the circuit court improperly denied her repeated requests to depose Jordan and to obtain documentary discovery prior to granting Jordan's motions for summary judgment. Knafel essentially argues in her Supreme Court Rule 191(b) (145 Ill. 2d R. 191(b)) affidavit that in order to properly oppose the motion for summary judgment, she needed relevant discovery from Jordan regarding the elements of his defense, namely, "reliance, materiality, good faith and mistake."

Discovery is authorized in the supreme court rules " 'regarding any matter relevant to the subject matter involved in the pending action.' " Computer Teaching Corp. v. Courseware Applications, Inc., 199 Ill. App. 3d 154, 157, 556 N.E.2d 816, 818 (1990), quoting 107 Ill. 2d R. 201(b)(1). "Discovery is to be a mechanism for the ascertainment of truth and for the purpose of promoting either a fair settlement or a fair trial." Computer Teaching Corp., 199 Ill. App. 3d at 157, 556 N.E.2d at 818. Because discovery focuses on the relevance and materiality of both admissible materials as well as materials that lead to what would be admissible at trial, Illinois trial courts traditionally have been given great latitude in determining the scope of discovery. Computer Teaching Corp., 199 Ill. App. 3d at 157, 556 N.E.2d at 818. "A trial court's discovery order is usually reviewed for an abuse of discretion." Wisniewski v. Kownacki, 221 Ill. 2d 453, 457, 851 N.E.2d 1243, 1245 (2006).

Here, we find no abuse of discretion in the trial court's decision to stay discovery that was not relevant to the evidentiary issues raised in the motion for summary judgment. The court found Knafel's Supreme Court Rule 191(b) (145 Ill. 2d R. 191(b)) affidavit was entirely conclusory. The court further found that discovery was unnecessary on the issues of materiality and reliance because those matters were demonstrated by Knafel's own verified pleadings and Jordan took those allegations as true for purposes of the motion. Furthermore, Knafel was given an opportunity by the court to refute the paternity evidence by deposing Dr. Strom and testing the basis for his assertions and the authenticity of the documents upon which he relied and to engage in additional paternity testing. She chose not to take that opportunity. Accordingly, it was not an abuse of discretion for the trial court to find that her assertions that she was "denied access to the

22

truth" to be baseless.

Lastly, where Jordan's complaint for declaratory judgment was premised upon the same arguments in defense of the counterclaim, namely, fraudulent inducement and mutual mistake of fact, the trial court properly granted summary judgment on his complaint as well. For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

GREIMAN and CUNNINGHAM, JJ., concur.