MICHAEL JORDAN, Plaintiff and Counterdefendant-Appellee and Cross-Appellant, v. KARLA KNAFEL, Defendant and Counter-plaintiff-Appellant and Cross-Appellee.

First District (4th Division)   No. 1—03—2152

Opinion filed February 3, 2005.

Michael T. Hannafan and Blake T. Hannafan, both of Michael T. Hannafan & Associates, Ltd., of Chicago, for appellant.

Frederick J. Sperling, Sondra A. Hemeryck, and Paul E. Greenwalt III, all of Schiff Hardin, L.L.P., of Chicago, for appellee.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff Michael Jordan sought a declaratory judgment that a contract asserted by defendant Karla Knafel was extortionate and void

against public policy. Knafel filed a counterclaim, alleging that Jordan owed her $5 million for breach of a confidential settlement agreement. The trial court dismissed the complaint and counterclaim, finding that Jordan failed to allege an actual controversy and that Knafel's alleged contract was unenforceable. Subsequently, Knafel's motion for leave to amend her counterclaim was denied.

On appeal, Knafel contends that the trial court erred in holding that the contract was unenforceable as extortionate and that it violated public policy. Jordan cross-appeals, contending that the trial court erred in dismissing his declaratory judgment action where there was an actual disagreement between the parties as to their respective legal obligations. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

On October 23, 2002, Jordan filed a complaint for a declaratory judgment and injunctive relief against Knafel, a woman with whom he had an intimate relationship. Therein, he alleged that Knafel, through her attorneys, was attempting to extort money from Jordan by threatening to publicly expose their relationship unless Jordan paid Knafel $5 million. He further alleged that Knafel had previously extorted $250,000 from him under threat of publicly exposing their relationship. Jordan denied that he agreed to pay Knafel $5 million pursuant to a purported second agreement and sought a declaratory judgment that her demand for payment was unenforceable because (i) extortionate agreements violate public policy; (ii) there would be no consideration to support any such agreement due to Knafel's existing obligation not to publicly expose their relationship; (iii) any such agreement would violate the statute of frauds because there is no agreement in writing; and (iv) any such agreement would be barred by the statute of limitations. Additionally, Jordan sought an order enjoining Knafel, and any other persons acting on her behalf, from engaging in further efforts to extort money from him.

Knafel responded to the complaint by filing a verified answer and affirmative defenses denying the material allegations of the complaint. Therein, she admitted that Jordan paid her $250,000, but stated that it was for her mental pain and anguish arising from their romantic relationship. In addition, Knafel filed a verified counterclaim asserting theories of breach of contract and anticipatory breach of contract based on Jordan's alleged breach of his promise to pay Knafel $5 million "when he retired from professional basketball in exchange for her agreement not to file a paternity suit against him and for her agreement to keep their romantic involvement publicly confidential." The following relevant facts were alleged in the verified counterclaim.

In the spring of 1989, Knafel was performing in a band at a hotel in Indianapolis, Indiana. The Chicago Bulls were in town to play the Indiana Pacers. After her performance, Knafel was introduced to Jordan over the telephone by Eddie Rush, a National Basketball Association (NBA) referee, who had approached Knafel at the hotel. Knafel declined an invitation from Jordan to meet him at the Indianapolis airport and continued to decline his invitations to meet during the spring and summer of 1989. Nevertheless, Jordan and Knafel continued long-distance telephone conversations during that time.

On September 2, 1989, Jordan married his wife, Juanita. In December 1989, Knafel traveled to Chicago to meet Jordan, where they had unprotected sex. Thereafter, in November 1990, Knafel stayed with Jordan in Phoenix, Arizona, where they again had unprotected sex. In early 1991, Knafel learned that she was pregnant. She believed the baby was Jordan's, but kept silent about the pregnancy for some time. The Bulls were on their way to their first NBA championship. Jordan's product endorsements were earning him large sums of money. Knafel alleged that as a result, Jordan was "troubled" when she told him she was pregnant with his child in the spring of 1991. He was worried about destroying his public image, which he and his agent had carefully cultivated, and was concerned about the loss of future endorsements. Knafel further alleged that Jordan demanded that she abort the baby, but because of her personal beliefs, she refused.

According to Knafel, in the spring of 1991, Jordan offered, and urged Knafel to accept, his proposed settlement agreement to resolve their problems. Jordan offered to pay her "$5 million when he retired from professional basketball in return for her agreement not to file a paternity suit against him in a court of law and for her agreement to keep their romantic involvement publicly confidential." Knafel accepted Jordan's offer. In consideration for his promise to pay her, she agreed to forbear filing a public paternity action against him and agreed to keep their romantic relationship confidential.

In July 1991, Knafel's child was born. Jordan paid certain hospital bills and medical costs and paid Knafel $250,000 for "her mental pain and anguish arising from her relationship with him." Knafel did not file a paternity suit against Jordan and she kept their relationship confidential. In October 1993, Jordan announced his retirement from the Bulls. However, in March of 1995, he returned to the NBA again to play for the Bulls. Knafel had not contacted Jordan to demand her payment of the $5 million amount which he had allegedly promised her in 1991. In September 1998, Knafel approached Jordan while he

was vacationing in Las Vegas. During their conversation, Knafel reminded Jordan of his obligation to pay her the money under their agreement. Knafel alleged that Jordan reaffirmed his agreement to pay her the $5 million. A few months later, Jordan retired from professional basketball again.

Two years later, Knafel's counsel contacted Jordan's counsel to resolve their contract dispute. Jordan denied that he had promised to pay Knafel $5 million. Knafel's counterclaim sought $5 million for breach of contract. Additionally, at the time Knafel filed her counterclaim, it was alleged that Jordan was playing basketball for the Washington Wizards. Accordingly, she also alleged an anticipatory breach of their 1991 contract and 1998 reaffirmation.

Thereafter, Jordan filed a hybrid motion for judgment on the pleadings, which was directed to his complaint, and a motion to dismiss Knafel's counterclaim pursuant to section 2—615 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2—615 (West 2002)). Therein, Jordan argued that the alleged agreement was unenforceable because it violated public policy or, in the alternative, that it was induced by fraud or mutual mistake of fact regarding the paternity of her child. The trial court initially struck the allegations raised in the motion for judgment on the pleadings that went beyond those pled in the declaratory judgment complaint, and struck the exhibits attached to Knafel's response brief. The court further declined to proceed with a hearing on the combined motions, and by agreement of the parties, proceeded to hear the motion for judgment on the pleadings. Jordan was then granted leave to file a separate motion to dismiss the counterclaim. Thereafter, Jordan filed his motion to dismiss the counterclaim pursuant to section 2—615 of the Code. He argued that the alleged agreement was unenforceable because (1) it was contrary to public policy; (2) it was fraudulently induced; and (3) if not fraudulently induced, it was based on a mutual mistake of fact as to paternity.

After a separate hearing on both motions, the trial court dismissed Jordan's complaint for declaratory judgment and denied his motion for judgment on the pleadings. The court found that Jordan failed to allege an actual controversy and that issuing a declaratory judgment on a hypothetical contract would constitute the rendering of an advisory opinion. The trial court further dismissed the counterclaim, finding the agreement to be extortionate and against public policy. Knafel subsequently filed a motion for leave to amend her verified counterclaims. Therein, she added a count for promissory and equitable estoppel and common law fraud. Her motion for leave to amend her verified counterclaims was denied.

ANALYSIS

Knafel initially contends that the trial court erred in dismissing her counterclaim and finding the alleged $5 million contract unenforceable as extortionate and against public policy. This issue comes before this court on a motion to dismiss the counterclaim pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 2002)). A section 2—615 motion attacks the sufficiency of the counterclaim and raises the question of whether the allegations, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. 735 ILCS 5/2—615 (West 2002); *Wallace v. Smyth*, 203 Ill. 2d 441, 447, 786 N.E.2d 980, 984 (2002). Further, the trial court should dismiss the cause of action only if it is clearly apparent that no set of facts can be proven which will entitle the plaintiff to recovery. *Canel v. Topinka*, 212 Ill. 2d 311, 317, 818 N.E.2d 311, 317 (2004). All well-pleaded facts are taken as true and all reasonable inferences that can be drawn from those facts are drawn in favor of the plaintiff. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86, 672 N.E.2d 1207, 1213 (1996).

In the present case, Jordan does not assert that Knafel failed to properly plead the elements of the claims asserted in her counterclaims. Rather, Jordan asserts that the contract is unenforceable because it is against public policy. That argument appears on the face of the pleadings and is therefore "peculiarly within the area of confluence between section 2—615 and section 2—619(a)(9)." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486, 639 N.E.2d 1282, 1290 (1994). Accordingly, we may review Jordan's motion pursuant to section 2—615(a), and our review is *de novo*. *Wallace*, 203 Ill. 2d at 447, 786 N.E.2d at 984.

■ We must begin our analysis with the premise that Illinois public policy strongly favors freedom to contract, and courts will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this state. *H&M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 209 Ill. 2d 52, 57, 805 N.E.2d 1177, 1180 (2004). Public policy is the legal principle that no one may lawfully do that which has the tendency to injure the welfare of the public. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 341, 537 N.E.2d 730 (1989). Thus, agreements are not void as against public policy unless they are

" 'clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they [are] manifestly injurious to the public welfare.' " *H&M Commercial Driver Leasing, Inc.*, 209 Ill. 2d at 57, 805 N.E.2d at 1180, quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330, 159 N.E. 250, 254 (1927).

The question of whether a contract is injurious to the public welfare is ultimately a conclusion of law (*Rome v. Upton*, 271 Ill. App. 3d 517, 520, 648 N.E.2d 1085, 1087-88 (1995)) and turns on the particular facts and circumstances of each case (*O'Hara*, 127 Ill. 2d at 341-42, 537 N.E.2d at 734).

In arguing that the alleged contract is unenforceable, Jordan asks this court to adopt a public policy in Illinois that all contracts involving the payment of money in exchange for silence are inherently extortionate. In contrast, Knafel argues that the trial court's ruling that the contract is extortionate would render all valid settlement agreements that incorporate a term of confidentiality to be against public policy. We make neither ruling today but, rather, consider the law as it applies to the facts and circumstances presented by this case under the procedural posture before us.

■ Not all contracts for silence violate public policy. Rather, there is a presumption of validity and enforceability attaching to settlement agreements which include confidentiality provisions. *Fidelity Financial Services, Inc. v. Hicks*, 267 Ill. App. 3d 887, 892, 642 N.E.2d 759, 762 (1994) (confidentiality clauses are common attributes of settlement agreements). Confidentiality agreements have often been utilized in various settings to protect the disclosure of valuable information. See, e.g., *Coady v. Harpo, Inc.*, 308 Ill. App. 3d 153, 719 N.E.2d 244 (1999) (confidentiality agreement restricting ability of former senior associate producer for well-known television talk show to disseminate confidential information she obtained while in the employ of the show's maker was reasonable and enforceable). However, we also recognize that there are contracts for silence that are unenforceable. For example, they may suppress information about harmful products or information about public safety, they may conceal criminal conduct, or they may constitute extortion or blackmail. See generally __. Garfield, Promises of Silence: Contract Law and Freedom of Speech, 83 Cornell L. Rev. 261 (1998).

■ In Illinois, "extortion" and "blackmail" are synonymous terms. *Becker v. Zellner*, 292 Ill. App. 3d 116, 129, 684 N.E.2d 1378, 1388 (1997), citing *People v. Mahumed*, 381 Ill. 81, 84, 44 N.E.2d 911 (1942). "Blackmail" has been defined as "[a] threatening demand made without justification." Black's Law Dictionary 163 (7th ed. 1999). The gravamen of these offenses is the exercise of coercion or an improper influence. *People v. Hubble*, 81 Ill. App. 3d 560, 564, 401 N.E.2d 1282, 1285 (1980). While Jordan does not argue that the alleged agreement is extortionate in the criminal sense, he argues that it is extortionate because the agreement involves the exchange of money for silence, which is inherently coercive and exploitive. He relies on the case of *In re Yao*, 661 N.Y.S.2d 199, 231 A.D.2d 346 (1997), for support.

In *Yao*, an attorney brought a breach of contract action against Mr. Bult, a wealthy financial executive with whom he had a brief, intimate relationship. In his complaint, the attorney alleged that he and Bult had entered into an enforceable oral contract pursuant to which Bult agreed to pay him $10,000 per month for life in exchange for his promise not to publicize certain embarrassing information about Bult's personal life. Bult refused to abide by such an agreement and the attorney filed the complaint. Bult moved to dismiss the complaint for failure to state a cause of action upon which relief could be granted. *Yao*, 661 N.Y.S.2d at 200-01, 231 A.D.2d at 347-48. The trial court found the alleged oral agreement to be illegal, finding it "nothing more than an attempt to extort money from an apparently wealthy but vulnerable individual." *Yao*, 661 N.Y.S.2d at 201, 231 A.D.2d at 348.

*Yao* is distinguishable from the present case. Here, Knafel's promise is twofold. Unlike *Yao*, we are not examining an exchange of money for silence in a vacuum but rather must look at the contract as a whole. *Owens v. McDermitt, Will & Emory*, 316 Ill. App. 3d 340, 344, 736 N.E.2d 145, 150 (2000) (contracts must be interpreted as a whole rather than focusing on isolated portions). Knafel allegedly approached Jordan with the fact that she was pregnant with his child. According to the complaint, she alleged that based upon that statement, Jordan subsequently approached her with a proposed settlement agreement, and "[t]hey discussed possible resolutions of their dilemma." If she agreed to forbear filing a paternity action and to remain silent about the details of their affair, he would pay her $5 million when he retired from professional basketball. Accordingly, here, there is an alleged nexus to a good-faith claim of right, a right to file a paternity action, which distinguishes this case from *Yao* and makes the alleged exchange one that is not necessarily a demand without legal justification or motivated by an improper influence.

The case of *Kaplan v. Kaplan*, 25 Ill. 2d 181, 182 N.E.2d 706 (1962), is instructive. There, a husband and wife in the midst of a divorce entered into a property settlement agreement. Three years later, the husband filed a complaint, alleging that the agreement had been entered into as the result of duress. He alleged that during the pendency of their separate maintenance action, his wife threatened to publicize embarrassing photographs depicting immoral behavior between the husband and another woman by suing the other woman for alienation of affections. Under duress, he agreed to sign the property settlement agreement. *Kaplan*, 25 Ill. 2d at 183-84, 182 N.E.2d at 708.

The court in *Kaplan* held that such a threat is not duress where the threatened action is made in the honest belief that a good cause of

action exists and does not involve some actual or threatened abuse of process. Based on the allegations of the complaint, the wife had a cause of action for alienation of affections. The court found that any use of the photographs in such a proceeding, or personal embarrassment suffered by plaintiff or his friend, as a result, would be no more than incidents of the suit. *Kaplan*, 25 Ill. 2d at 188, 182 N.E.2d at 710. The court also held that duress is not shown by subjecting someone to annoyance and vexation and that a threat of personal embarrassment does not rise above annoyance and vexation. *Kaplan*, 25 Ill. 2d at 188, 182 N.E.2d at 710.

Therein, the court also cited the case of *Schumm v. Berg*, 37 Cal. 2d 174, 231 P.2d 39 (1951). In *Schumm*, the supreme court of California held that the expressed intention of the mother of an illegitimate child to institute a paternity proceeding against the putative father if he did not enter into a contract for the support of the child did not make the contract unenforceable as having been obtained by a threat to expose the affair and injure the father's reputation. The father, like Jordan, was a wealthy celebrity who would suffer unfavorable publicity if the paternity suit was brought and the facts of the affair were made public. The *Schumm* court found that the complaint did not allege that the mother would injure his character if he did not enter into the contract. Rather, it alleged that she would commence a suit, a right she clearly had. "A sufference by him of unfavorable publicity would only be an incident of the suit." *Schumm*, 37 Cal. 2d at 185-86, 231 P.2d at 45.

Thus, as alleged, Knafel's agreement to refrain from suing for paternity coupled with her agreement to remain quiet about the affair is not inherently coercive or exploitive or motivated by an improper influence. Rather, taking the facts alleged in the light most favorable to Knafel, as we must do when reviewing a section 2—615 motion to dismiss, the agreement could be construed as a good-faith settlement of her paternity claim with a confidentiality provision which is not violative of public policy. This court reiterated in *Becker* that declaring that " 'one intends to use the courts to insist upon what he believes to be his legal rights' [is] not actionable" as intimidation, extortion or blackmail. *Becker*, 292 Ill. App. 3d at 129, 684 N.E.2d at 1388, quoting *Enslen v. Village of Lombard*, 128 Ill. App. 3d 531, 533, 470 N.E.2d 1188, 1190-91 (1984).

Furthermore, we adhere to the view that the trial court should dismiss a cause of action on the pleadings only if it is clearly apparent that no set of facts can be proven which will entitle a plaintiff to recover. *Nickum*, 159 Ill. 2d at 488, 639 N.E.2d at 1291. We find that whether this particular oral agreement was exploitive or coercive is a

matter best left to the trier of fact. Knafel alleged that she told Jordan she was pregnant with his child, that he did not want the publicity, and that he made her an offer to deal with their problem. While we agree with Jordan that there need not be an explicit threat for a contract to be coercive or exploitive, this court has stated that an inquiry regarding the coercive nature of the language used is a fact-intensive inquiry:

> "[W]hile the issue of whether particular words have a reasonable tendency to coerce or cause apprehension is essentially an objective determination, the subjective reactions of the recipients is a proper factor to consider.
>
> > 'It is not the abstract meaning of words that constitutes an expression [of] a threat, but their reasonable tendency under the circumstances to place another in fear that the threat-maker will perform the threatened act. An innocent expression may be threatening because of the ominous circumstances in which it is made. Similarly, a statement that is literally a declaration of intent to do harm to another is not a threat if the context negatives any reasonable apprehension that the speaker intends what he says he intends.' " *People v. Peterson*, 306 Ill. App. 3d 1091, 1103-04, 715 N.E.2d 1221, 1227-28 (1999), quoting *Landry v. Daley*, 280 F. Supp. 938, 962 (N.D. Ill. 1968).

Accordingly, where these are factual determinations and credibility determinations that have yet to be resolved, we cannot make a determination on the pleadings alone that this contract is extortionate.

Jordan next maintains that the alleged agreement is unenforceable because it was either fraudulently induced or based upon a mutual mistake of fact. Again, we must consider the procedural posture of the case. These arguments were made in the context of a section 2—615 motion to dismiss. As stated previously, section 2—615 provides for dismissal for "defects in pleadings" where the counterclaim is "substantially insufficient in law." 735 ILCS 5/2—615 (West 2002). Motions to dismiss pursuant to this section attack only the legal sufficiency of the counterclaim. As such, a party may not raise affirmative factual defenses under a section 2—615 motion but, rather, may only allege defects on the face of the counterclaim. *Becker*, 292 Ill. App. 3d at 124, 684 N.E.2d at 1385.

Section 2—619(a)(9) of the Code allows for dismissal on the pleadings if "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2—619(a)(9) (West 2002). It is well settled that under section 2—619, any grounds for dismissal not appearing on the face of the counterclaim shall be supported by affidavit. 735 ILCS 5/2—619(a)

(West 2002). Here, both of Jordan's arguments regarding fraudulent inducement and mutual mistake of fact rely on the crucial fact of whether Jordan was the father of Knafel's child. While Jordan maintains that it is undisputed that he is not the father, that fact does not appear on the face of the pleadings before this court. Nor have the parties submitted the required affidavits to attest to the fact that Jordan is not the father of the child. Where the extrinsic facts asserted in the motion to dismiss are crucial to Jordan's arguments, yet were not submitted via proper affidavit, Jordan's motion to dismiss, even if we were to construe it as a section 2—619(a)(9) motion, is legally insufficient. *Becker*, 292 Ill. App. 3d at 124, 684 N.E.2d at 1385.

Jordan essentially argues that while Knafel's verified counterclaims are silent on the issue of paternity, Knafel made judicial admissions both in memorandum of law filed with the court and at oral argument before the trial court that Jordan is not the father of her child. Jordan is correct that a court may consider judicial admissions in the record when ruling on a motion to dismiss. *Weiss v. Waterhouse Securities, Inc.*, 335 Ill. App. 3d 875, 882, 781 N.E.2d 1105, 1111 (2002). A judicial admission is "a deliberate, clear, unequivocal statement of a party regarding a concrete fact within the party's peculiar knowledge and is conclusive upon the party making it, thereby relieving the opposing party from presenting any evidence." *Bank of Chicago v. Park National Bank*, 277 Ill. App. 3d 167, 172, 660 N.E.2d 19, 22-23 (1995). The record reflects that Knafel's counsel only indicated that there was no allegation in the verified pleading that Jordan is the father. However, that statement is not a judicial admission that Jordan is not the father of this child, which would relieve the opposing party from presenting evidence of its affirmative defense. Thus, where there are insufficient facts with which to dismiss the cause on either basis asserted by Jordan, we need not address the merits of these contentions under either a section 2—615 motion or section 2—619(a)(9) motion.

■ We next address Jordan's cross-appeal. Therein, he argues that the trial court erred in dismissing his complaint for declaratory judgment. A complaint for declaratory judgment must recite in sufficient detail an actual and legal controversy between the parties and that the plaintiff is interested in such controversy. 735 ILCS 5/2—701 (West 2002); *Beahringer v. Page*, 204 Ill. 2d 363, 372, 789 N.E.2d 1216, 1223 (2003). Moreover, Illinois is a fact-pleading jurisdiction. A plaintiff must allege facts sufficient to bring his or her claim within the scope of the cause of action asserted. *Beahringer*, 204 Ill. 2d at 369, 789 N.E.2d at 1221. Our review of the dismissal is *de novo*. *Parish v. Country Mutual Insurance Co.*, 351 Ill. App. 3d 693, 695, 814 N.E.2d 166, 168 (2004).

We agree with the trial court that when examining the face of the pleadings, the complaint is deficient. Essentially, Jordan alleges that Knafel threatened to publicly expose their relationship unless Jordan paid her $5 million pursuant to a purported agreement. He denies that there was an agreement and seeks a declaration that any purported agreement was unenforceable because (i) extortionate agreements violate public policy; (ii) there would be no consideration to support any such agreement due to Knafel's existing obligation not to publicly expose their relationship; (iii) it would violate the statute of frauds; and (iv) it would be barred by the statute of limitations. Jordan never sets out the terms of the "purported second agreement" such that any of the above arguments could be ruled upon by the court. Accordingly, the complaint lacks sufficient facts to bring the claim within the scope of the cause of action asserted.

Nevertheless, as we previously stated, a court may consider judicial admissions in the record on a motion to dismiss. *Weiss*, 335 Ill. App. 3d at 882, 781 N.E.2d at 1111. Where the terms of the agreement were set forth in detail in Knafel's verified counterclaim, there are sufficient facts before the court at this time to establish an actual controversy. Accordingly, it was error to dismiss Jordan's complaint for declaratory judgment. However, where the same issues are raised in the motion for judgment on the pleadings as were raised in the motion to dismiss the counterclaim, and the procedural posture is ultimately the same, we deny the motion for judgment on the pleadings for the same reasons as stated previously.

Accordingly, for all of the foregoing reasons, we reverse the dismissal of Jordan's complaint for declaratory judgment and reverse the dismissal of Knafel's counterclaim. Additionally, we affirm the dismissal of Jordan's motion for judgment on the pleadings and remand this cause to the circuit court for further proceedings.

Affirmed in part and reversed in part; cause remanded.

REID, P.J., and QUINN, J., concur.