2024 IL App (1st) 231526

FIFTH DIVISION
September 6, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-23-1526

| | | |
|---|---|---|
| RSA PROPERTIES MISSION HILLS, P.C., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| v. | ) | |
| | ) | No. 22 CH 11902 |
| MISSION HILLS HOMEOWNERS ASSOCIATION, | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Caroline Kate Moreland, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Mitchell and Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    RSA Properties Mission Hills, P.C. (RSA), alleged that the Mission Hills Homeowners Association (Association) had improperly asserted a lien against a parcel of property that RSA owned and was in the process of selling. RSA paid the Association $35,000 to release the lien so its buyer would agree to go through with the sale. It then sued the Association, seeking (1) a declaration that both the lien and the release were void; (2) return of the $35,000, which it alleged was paid under duress; and (3) damages for tortious interference with the sales contract.

¶ 2    The circuit court dismissed the complaint with prejudice under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2022)). It concluded that RSA improperly sought a declaration to remedy past conduct, rather than to guide future action, and that no breach of contract had been alleged because the sale ultimately did go through.

¶ 3    RSA now appeals, and, for the reasons that follow, we affirm in part and reverse in part the circuit court's dismissal.

¶ 4                                    I. BACKGROUND

¶ 5    A class action settlement agreement attached to RSA's complaint provides background regarding the Mission Hills development and the Association's rationale for asserting a lien in this case. The 144-acre Mission Hills property, located northeast of the intersection of Techny and Sanders Roads in Northfield Township, was initially developed by Eugene R. Corley Builders (Corley) and consisted of residential units and a country club. The settlement, reached on January 5, 1984, resolved claims of antitrust and other statutory violations brought against Corley by the unit owners. Pursuant to that agreement, the unit owners retained the development property, defined as "the horseshoe shaped parcel of approximately 57 acres dedicated to common residential ownership," and Corley retained the balance of Mission Hills (the Retained Property), which "consist[ed] largely of the golf course, clubhouse and adjacent parking lot, tennis courts, a swimming pool, an administrative building and the roadway immediately adjoining the clubhouse."

¶ 6    In exchange for the right to use the main gate for ingress and egress to and from the "Clubhouse"—defined as "the building located on the Retained Property and used as the clubhouse for the golf course"—Corley agreed that it "and any subsequent purchasers or owners of the Clubhouse" would "pay to the Homeowners Association *** twelve percent (12%) of all costs and expenses of repairing, maintaining and replacing the perimeter fence and front gate." The settlement stated that "[s]uch covenant [would] run with the land" and "the nonpayment of such amount [would] result in a lien upon the Retained Property equal to the delinquent amount."

¶ 7    RSA, which has described itself only as a limited liability company licensed to do business in Illinois, alleged that on September 30, 2021, it acquired a parcel of property located at 3600 Techny Road in Northbrook that is referred to as the "Maintenance Shed." RSA alleged that the Maintenance Shed was a separate parcel from the Clubhouse referred to in the class action settlement agreement and that RSA "had no ownership interest in the Clubhouse at any time." It further alleged that, although the gate expenses detailed in the settlement agreement were the obligation of the Clubhouse owners, on January 27, 2022, the Association recorded a lien against the Maintenance Shed in the amount of $320,281.27, for nonpayment of those expenses.

¶ 8    RSA alleged that it received no notice of the lien and only learned of it when it made efforts to sell the Maintenance Shed in October 2022. RSA contacted the Association at that time, explaining that because payments were due from the owner of the Clubhouse and not the Maintenance Shed, a lien on the Maintenance Shed was improper. The Association said that it was in negotiations with the owner of the Clubhouse and expected to resolve the matter soon. As the date of the closing approached, however, the prospective buyer expressed concern, and RSA put the buyer's counsel in direct contact with the Association. The complaint alleges that the Association told the buyer that if it purchased the Maintenance Shed, it "would be not only liable for the full amount of the lien, but also for 12% of all future costs and expenses for the security gate." That same day, the Association sent RSA a letter demanding payment of $48,042.19 to release the lien.

¶ 9    RSA alleged that, following these conversations, the purchaser called to cancel the contract and demanded a return of its earnest money. RSA told the purchaser it would try to get the Association to release the lien and, under duress, paid the Association $35,000 to do so. It alleged that this agreement was extortionate and contrary to public policy, that it lacked mutual

3

consideration because the lien was legally baseless, and that RSA only paid to release the lien because it did not have time to file an action to quiet title due to the exigencies of the pending sale. Following RSA's payment, the lien was released, the release was memorialized in writing by the purchaser's attorney, and the sale went ahead. RSA then brought this litigation against the Association on December 8, 2022, seeking a declaration that both the lien and the release were void, return of the $35,000, and damages for tortious interference with the sales contract. RSA attached to its complaint copies of the recorded lien, the class action settlement agreement, the sales contract for the Maintenance Shed, and the written release of the lien.

¶ 10    The Association moved to dismiss the complaint, under section 2-615 of the Code (*id.*), for failure to state a claim on which relief could be granted. It argued that (1) RSA was improperly seeking declaratory relief to remedy past conduct; (2) RSA could not state a cause of action for tortious interference with contract because the sale did ultimately occur, and there was thus no breach; (3) the new owner of the Maintenance Shed was a necessary party who had not been joined; and (4) RSA was entitled to no relief because the lien was valid.

¶ 11    As support for this last argument, the Association presented a chronology detailing the transactions by which it claimed the Retained Property, as defined in the class action settlement, had been divided and sold over the years. It attached directly to its motion a number of quit claim deeds and other documents not referred to or incorporated by reference in RSA's complaint. The Association argued that these documents proved the Maintenance Shed was initially part of the Retained Property and that it was thus, per the plain language of the class action settlement agreement, subject to a lien for nonpayment of the costs associated with the security gate.

¶ 12    RSA argued in response to the motion that (1) declaratory relief was proper because it had only paid the $35,000 under duress and "a real and justiciable controversy" existed as to the

validity of both the lien and the release; (2) it had sufficiently alleged a breach of the initial sales contract, even if a sale based on different terms eventually occurred; (3) any effect this litigation could have on the new owner of the Maintenance Shed was speculative and insufficient to make them a necessary party; and (4) the Association's efforts to demonstrate that the Maintenance Shed was once part of the Retained Property were improper attempts to rely on matters outside the complaint in a 2-615 motion to dismiss, the purpose of which is to challenge the sufficiency of the allegations on their face.

¶ 13    The circuit court issued a written memorandum and order dismissing the complaint with prejudice on August 3, 2023. Noting that the declaratory judgment statute is intended to allow a court "to take hold of a controversy one step sooner than normally—that is, after the dispute has arisen, but before steps are taken which give rise to claims for damages or other relief" (internal quotation marks omitted), the circuit court agreed with the Association that declaratory relief was not proper here, where RSA was not seeking a declaration to guide any future conduct, but solely sought to remedy actions that had already been taken.

¶ 14    The court also agreed with the Association that RSA had failed to state a claim for tortious interference with contract. In the court's view, RSA had alleged only that the prospective buyer of the Maintenance Shed made a statement that it *intended* to breach the contract, but that this statement of future intent was never "accept[ed] or act[ed] upon" by RSA.

¶ 15    The court did not reach the Association's alternative arguments for dismissal.

¶ 16    RSA now appeals.

¶ 17                                II. JURISDICTION

¶ 18    The circuit court entered its memorandum opinion and order dismissing RSA's complaint with prejudice on August 3, 2023, and RSA filed a timely notice of appeal from that order on

5

August 23, 2023. This court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 19                                    III. ANALYSIS

¶ 20    A section 2-615 motion to dismiss "challenges the legal sufficiency of a complaint based on defects apparent on its face." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). The essential question is whether the allegations of the complaint are "sufficient to state a cause of action upon which relief can be granted." *Lintzeris v. City of Chicago*, 2023 IL 127547, ¶ 18. In making that assessment, "a court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them." *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. A cause of action should not be dismissed pursuant to this section "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." (Internal quotation marks omitted.) *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 18. Our review is *de novo*, and we may affirm on any grounds supported by the record. *Dratewska-Zator v. Rutherford*, 2013 IL App (1st) 122699, ¶ 16.

¶ 21                              A. Declaratory Relief

¶ 22    We first consider the circuit court's dismissal of RSA's claim for declaratory relief. Section 2-701(a) of the Code provides that a circuit court may, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments," including "the construction of any *** contract or other written instrument, and a declaration of the rights of the parties interested." 735 ILCS 5/2-701(a) (West 2022). The declaratory judgment statute is "liberally construed and should not be restricted by unduly technical interpretations" (*First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 174 (1995)), though its application must still comport

with the general rule that "[c]ourts cannot pass judgment on mere abstract propositions of law, render advisory opinions, or give legal advice as to future events" (*Shipp v. County of Kankakee*, 345 Ill. App. 3d 250, 255 (2003)). Declaratory relief is only proper if there is an actual legal controversy between the parties, *i.e.*, if there is "a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof." *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977).

¶ 23    If the controversy is theoretical, rather than actual, then the claim is premature. *Adkins Energy, LLC v. Delta-T Corp.*, 347 Ill. App. 3d 373, 376 (2004). But if the parties' rights are fixed, *i.e.*, if "the controversy has progressed so far that there is nothing left for [them] to do except file suit for damages or other consequential relief," then the claim has been brought too late; there may be a claim for damages, but a declaratory judgment is no longer proper. *Id.* at 376. This is because the purpose of a declaratory judgment is to allow the parties to a dispute to "learn the consequences of their action[s] before acting." (Internal quotation marks omitted.) *Beahringer v. Page*, 204 Ill. 2d 363, 372-73 (2003). There must be at least some future conduct that the declaration sought will guide. Here, RSA has established, as it repeats again and again in its brief, that there is an actual, rather than a theoretical, controversy concerning the validity of the release and the lien. It has not established, however, the second parameter for declaratory relief—that there is some future conduct that will be guided by a declaration of the parties' rights.

¶ 24    The circuit court in this case relied on *Howlett v. Scott*, 69 Ill. 2d 135, 143 (1977), for the proposition that declaratory relief cannot remedy past conduct. The plaintiff in that case asked the court to declare that no conflict of interest prevented him from keeping payments he had already accepted as a consultant to a private company while holding office. *Id.* at 138-40. In dismissing

that claim, the *Howlett* court noted that the plaintiff had already terminated the consulting agreement that gave rise to the controversy. *Id.* at 143. If the consulting arrangement had been ongoing, declaratory relief may well have been proper. We reached a similar conclusion in *Babbitt Municipalities, Inc. v. Health Care Service Corp.*, 2016 IL App (1st) 152662, also relied on here by the circuit court. The plaintiff in that case was the policyholder of a health care service corporation and sought a declaration concerning the organization's obligations under its articles and bylaws. *Id.* ¶¶ 4, 13. We decided the appeal on other grounds, but noted that the claim would "not necessarily" be barred by the rule against declaratory relief addressing past conduct because the parties had "an ongoing relationship," such that "a declaratory judgment action might be appropriate to guide their future conduct." *Id.* ¶ 41.

¶ 25 We agree with the Association that *BMO Harris Bank, N.A. v. Jackson Towers Condominium Ass'n*, 2018 IL App (1st) 170781, is directly on point, applying these principles in nearly identical circumstances. The plaintiff there, a bank, was the successful bidder for a condominium unit at a judicial foreclosure sale. *Id.* ¶ 1. The bank was under contract to sell the unit when the condo association and property manager asserted a lien on the property for the nonpayment of presale assessments. *Id.* They changed the locks and denied the plaintiff entry to the unit until payment was made. *Id.* ¶ 16. Although the bank did not believe it was responsible for the presale assessments, it paid them so that the association would release the lien and restore its access to the unit. *Id.* ¶¶ 1, 16. It then sued the association and property manager for, among other things, a declaration that the lien was improper and that the money it had paid for the lien to be released must be returned to it. *Id.* ¶ 17.

¶ 26 This court affirmed the dismissal of that claim, on the basis that the plaintiff was seeking a declaration solely to address past conduct. *Id.* ¶ 26. We noted that "[a]lthough a declaratory

8

judgment action is proper to determine the parties' existing rights, the court may dismiss such an action where the party seeks to enforce his rights after the fact." *Id.* ¶ 24. BMO's complaint for declaratory judgment "was not a proper vehicle" to contest the association's lien for the presale assessments because it "was seeking to enforce its rights *after* having paid those assessments." (Emphasis in original.) *Id.* ¶ 25. As we unequivocally stated, "[t]he purpose of the declaratory judgment action is to give guidance for future conduct, not to provide relief related to past conduct." *Id.* ¶ 26 (citing *Babbitt*, 2016 IL App (1st) 152662, ¶ 41).

¶ 27 RSA attempts to distinguish *BMO Harris* on the basis that the plaintiff in that case did not specifically allege, as RSA has here, that it paid the money demanded of it only under duress. RSA cites a number of cases standing for the proposition that payments made under duress are generally recoverable under the law. That is absolutely true. Under the voluntary payment doctrine, money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment generally cannot be recovered, but payments made in the face of " 'some necessity which amounted to compulsion' " can. *Midwest Medical Records Ass'n v. Brown*, 2018 IL App (1st) 163230, ¶¶ 23-24 (quoting *Illinois Glass Co. v. Chicago Telephone Co.*, 234 Ill. 535, 541 (1908)).

¶ 28 RSA's argument confuses its right to some remedy with its right to *this* remedy—a declaratory judgment. Money paid under duress may well be recoverable—through a claim for money had and received *in assumpsit*, for example. See *Butitta v. First Mortgage Corp.*, 2018 Ill. App. 3d 12, 15 (1991) (noting that to establish such a claim, "a plaintiff must allege that (1) he was compelled to pay money to the defendant, (2) the defendant had no legal right to demand the money, and (3) payment was necessary in order to avoid an injury to his business, person or property"); see also *Jet Acquisitions, LLC v. Brooks*, 2023 IL App (1st) 221273-U, ¶¶ 12, 20

(affirming the circuit court's grant of summary judgment in the plaintiff's favor based on evidence proving each of these elements). But the fact that there may be a claim does not mean that declaratory relief, which is intended to guide future conduct, will be appropriate in all such cases.

¶ 29 RSA points to a number of cases in which both declaratory relief and the return of money paid under duress were sought. What it fails to appreciate, however, is that, in each of those cases, there was some ongoing practice pursuant to an in-force contract, statute, ordinance, or policy, that remained on the books, such that a determination of the parties' rights under that document would guide their future conduct and would not constitute merely a backward-looking pronouncement regarding their past conduct.

¶ 30 The plaintiffs in *Walker v. Chasteen*, 2021 IL 126086, ¶ 1, for example, brought a class action challenging the constitutionality of a statute that imposed a filing fee in mortgage foreclosure cases. They sought not only a return of the filing fees they had already paid under protest, but also injunctive relief and a declaration that the statute, which was still being applied, was facially unconstitutional. *Id.* ¶ 8. The plaintiffs in *Midwest Medical Records*, 2018 IL App (1st) 163230, ¶ 1, similarly challenged the ongoing practice of the clerk of the circuit court to charge a filing fee for certain documents. And the plaintiffs in *Raintree Homes, Inc. v. Village of Long Grove*, 389 Ill. App. 3d 836, 838-39 (2009), challenged a village ordinance, also still being applied, that required the payment of impact fees as a condition for obtaining a building permit.

¶ 31 The list goes on. See *Getto v. City of Chicago*, 86 Ill. 2d 39, 42 (1981) (challenge to a utility providers ongoing method of calculating a city tax); *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389, 392 (1989) (challenge to the ongoing taxation of female hygienic products); *Edward P. Allison Co. v. Village of Dolton*, 24 Ill. 2d 233, 234 (1962) (challenge to an in-force municipal ordinance imposing license and inspection fees); *Paine/Wetzel Associates, Inc. v. Gitles*, 174 Ill.

App. 3d 389, 391 (1988) (challenge to the validity of an existing lien); *Heritage Pullman Bank & Trust Co. v. Carr*, 254 Ill. App. 3d 676, 677-78 (1993) (declaration sought by trustees regarding the requirements to sell property held in a land trust); *Illinois State Toll Highway Authority v. Amoco Oil Co.*, 336 Ill. App. 3d 300, 303 (2003) (declaration sought regarding who was responsible under the parties' agreements to clean up after an oil spill). RSA has not cited a single case in which declaratory relief was deemed proper where there was not at least the potential that it would guide the parties' *future* conduct.

¶ 32    RSA instead directs our attention to cases in which a declaratory judgment was used to clarify the parties' rights under a contract. It notes, in particular, the court's agreement, in *Albright v. Phelan*, 2 Ill. App. 3d 142 (1971), with the plaintiffs in that case that " 'declaratory relief may be had as well after as before the stage of relief by coercion has been reached.' " *Id.* at 146 (quoting Ill. Ann. Stat., ch. 110, ¶ 57.1, Historical and Practice Notes, at 127 (Smith-Hurd 1968)). But again, the plaintiff in *Albright* had ongoing contractual relationships with the defendants in that case; he had disclosed his inventions to them in exchange for their agreements to license the manufacture and marketing of those inventions and pay him a royalty on net sales. *Id.* at 144. He alleged that they then conspired with each other to deprive him of the benefits of the contracts. *Id.* In addition to damages and declaratory relief, the plaintiff asked that the defendants "be restrained from interfering with his contractual rights." *Id.* In finding declaratory relief was properly sought, the *Albright* court specifically distinguished the case before it, where the "[p]laintiff properly sought to have his rights declared and *to prevent future contractual breaches by the defendant*" (emphasis added) (*id.* at 147), from *Goldberg v. Valve Corp. of America*, 89 Ill. App. 2d 383 (1967), a wrongful discharge case relied on by the defendants, where " 'the contractual relationship having been severed, the only bona fide issue presented by the complaint was whether or not [the]

plaintiff's discharge was justified,' " a question that could be resolved through a traditional claim for breach of contract (*Albright*, 2 Ill. App. 3d at 147 (quoting *Goldberg*, 89 Ill. App. 2d at 391)).

¶ 33    *Alderman Drugs, Inc. v. Metropolitan Life Insurance Co.*, 79 Ill. App. 3d 799 (1979), is likewise a case that involved ongoing contractual relationships. There, a class of drug companies and pharmaceutical associations brought a class action against a life insurance company, seeking a declaration that the defendant insurance company's proposed amendment to the parties *ongoing* contracts was void. *Id.* at 801-02. Although the court noted that a class representative whose contract had been terminated was still entitled to "a determination of its rights under the contract," what made *declaratory relief* proper in that case was the fact that most of the companies had not yet been terminated. *Id.* at 804. A declaration of their rights under the agreements was necessary to guide the future conduct of most of the plaintiffs in that case because the insurance company was telling them that they had to either "accept the amendment or quit." *Id.*

¶ 34    The plaintiff in *Jordan v. Knafel*, 355 Ill. App. 3d 534 (2005), also needed to know what his obligations were going forward. The defendant in that case asserted that she had agreed, in exchange for future payment, not to publicly expose her relationship with him, and the plaintiff sought a declaration that the agreement was extortionate and void against public policy. *Id.* at 535-36. We held that it was error for the circuit court to dismiss that claim. *Id.* at 536, 545. Although the contract in *Jordan*, like the release here, contemplated only a single transaction, there the money *had not yet been paid*. The plaintiff was in court to learn the consequences, if any, of his continued refusal to pay. The declaration he sought would guide his future conduct.

¶ 35    Here, there is no ongoing relationship or agreement still in force pursuant to which the parties must attempt to conform their future conduct. RSA paid the $35,000, and the Association released the lien. They performed their obligations under the release, and their business is done.

Their rights are fixed. A declaratory judgment would serve no practical purpose because there is no future conduct that can be guided, nor future litigation that can be avoided, by a fuller understanding of the parties rights under that fully executed agreement. We therefore affirm the circuit court's dismissal of RSA's claim for declaratory relief.

¶ 36                         B. Tortious Interference With Contract

¶ 37    To state a claim for tortious interference with an existing contractual right, a plaintiff must allege

> "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." (Internal quotation marks omitted.) *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 154-55 (1989).

The only element that the Association contends or that the circuit court found was missing here is a breach caused by the Association's allegedly wrongful conduct. The circuit court agreed with the Association that because the buyer ultimately did go forward with its purchase of the Maintenance Shed, there was no breach of contract. However, the sale that went forward was not the same one that was originally contemplated. According to RSA, it not only did not occur on the date specified in the original agreement, but it also contained a significant new material term: the release that RSA alleges it was required to acquire because of an unauthorized lien placed on the property.

¶ 38    RSA alleged in its complaint that on or about October 14, 2022, it entered into a contract to sell the Maintenance Shed to a prospective buyer for $519,750. That sale was scheduled to take

place on November 15, 2022, as provided in the purchase and sale agreement. RSA further alleged that upon learning of the lien, its business manager, Jerry Berlin, contacted Andy Schrag, who represented the Association, and Mr. Schrag told Mr. Berlin that he was in negotiations with the owner of the Clubhouse and expected to resolve the issue soon.

¶ 39    On November 14, 2022, the day before the closing was to occur, Thomas Witek, counsel for the buyer, again expressed concerns about the lien to Mr. Berlin, and Mr. Berlin gave him Mr. Schrag's phone number. Mr. Witek then spoke directly with Mr. Schrag, who told Mr. Witek that if Mr. Witek's client purchased the property, the client would be responsible for the full amount of the lien, plus 12% of all future costs and expenses associated with the security gate.

¶ 40    RSA alleged that Mr. Witek notified Mr. Berlin in writing that same evening that his client "was canceling its purchase of the Subject Property based on the claims made by [Mr. Schrag]" and was demanding a return of his earnest money. RSA made clear the next morning that "if [the buyer] refused to close on the sale *that day* it would be in breach of [their] agreement." (Emphasis added.) In an attempt to "resuscitate" the deal, however, Mr. Berlin told Mr. Witek that he would try to get the Association to release the lien. According to the allegations, "[Mr.] Witek demanded that [RSA] not only obtain a release of the lien, but also a release of any future liability for the 12% contribution to the guardhouse expenses," and that he do so in writing.

¶ 41    Mr. Berlin contacted Mr. Schrag and told him the buyer had "walked out on the deal" and was demanding a release of the lien. He stated that the lien was invalid and that the Association's assertions to the contrary to Mr. Witek were an attempt to "shake down" RSA for money. Lacking time to file an action to quiet title "due to the exigencies of the pending sale," RSA ultimately agreed to pay the Association $35,000 for a full release of the lien and any future obligation to contribute to the cost of the gate. It did so "not because it believed that there was any legitimate

14

basis for said demand, but under duress and solely in order to consummate its sale of the Subject Property to [its buyer]." RSA believed that if its buyer did not close on the sale "it would be a 'red flag' that the property was problematic," preventing RSA from finding another buyer.

¶ 42    Mr. Witek memorialized the release in writing and, once the $35,000 was paid and the release was signed, his client went ahead with the closing. Although RSA does not allege when the closing actually took place, the release of the lien, which is attached to the complaint, is dated November 22, 2022, one week after the date the parties had previously agreed on in the agreement that is also attached to the complaint. Also, that sales contract clearly states that time was of the essence.

¶ 43    Counsel for the Association points out that the deed itself is dated November 14, 2022, and urges us to find that this exhibit to the complaint controls over RSA's allegations and other exhibits like the release. While the deed could control over allegations if there were a conflict between the two (*Northwestern Illinois Area Agency on Aging v. Basta*, 2022 IL App (2d) 210234, ¶ 31), no conflict exists here. The date on the deed is consistent with RSA's allegations that the parties were preparing to close on the property on November 15, 2022, and that the November 14, 2022, conversation between Mr. Witek and Mr. Schrag derailed that plan. The complaint and release together suggest that the closing did not actually take place until November 22, 2022, once the release was signed.

¶ 44    The circuit court, quoting *Alvey-Ferguson Co. v. Ernst Tosetti Brewing Co.*, 178 Ill. App. 536, 545 (1913), concluded that these allegations amounted to " 'a mere notice of an intended breach of contract' " on the buyer's part that could be " 'withdrawn at any time before performance [wa]s in fact due.' " It concluded that at no point did RSA "accept or act upon the communications from the buyer's attorney that the buyer was terminating the contract."

¶ 45     That is simply incorrect. The complaint alleges that the buyer provided RSA, through his counsel, with written notice that he "was canceling" the purchase, along with a demand for the return of his earnest money. That cannot reasonably be construed as an empty threat or a statement that the buyer might cancel the contract at some time in the future. And RSA certainly did allege that it acted upon the buyer's notice of termination—it negotiated with the Association for a release of the lien, a new material term the buyer was now demanding that was not a part of the original sales contract. The addition of a new material term creates a new contract. See *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 637 (2008) ("a contract modified by the parties creates a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed" (internal quotation marks omitted)). Here, an additional term of the new purchase agreement, according to the allegations, was a written release showing that the lien no longer encumbered the property.

¶ 46     "[T]here need not be a termination of the contract before a cause of action for intentional interference with contractual relations obtains," however. *Certified Mechanical Contractors, Inc. v. Wight & Co.*, 162 Ill. App. 3d 391, 398-99 (1987). Rather, "[f]or any breach that has occurred, be it large or small, 'partial or total,' an action can be maintained and the law will give an appropriate remedy." (Internal quotation marks omitted.) *Id.* at 399. Here, even if what occurred according to RSA's allegations was not the cancelation of one contract and the creation of a new one, the initial contract stated that time was of the essence and that the sale would close on November 15, 2022. RSA has clearly alleged that, because of the Association's representations to the buyer on November 14, 2022, the sale did not close until at least November 22, 2022, when the written release of the lien was signed. The buyer did not, as the Association insists, close on the sale "as planned."

¶ 47    RSA has stated a claim for tortious interference with contract, and the circuit court erred in dismissing this claim.

¶ 48                    C. The Association's Alternative Bases for Dismissal

¶ 49    We are unpersuaded by the Association's suggestion that we can affirm the circuit court's total dismissal of RSA's claims on two alternative bases: that RSA failed to join the new owner of the maintenance shed as a necessary party and that the lien was valid.

¶ 50    We do not think the purchaser of the maintenance shed was a necessary party.

> "A party is necessary if its participation 'is required to (1) protect its interest in the subject matter of the controversy which would be materially affected by a judgment entered in its absence; (2) reach a decision protecting the interests of the parties already before the court; or (3) allow the court to completely resolve the controversy.' " *City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, ¶ 34 (quoting *Zurich Insurance Co. v. Baxter International, Inc.*, 275 Ill. App. 3d 30, 37 (1995)).

For the first of these justifications to be present, "[t]he interest of the necessary party must be present and substantial rather than a mere expectance or future contingency." (Internal quotation marks omitted.) *Id.*

¶ 51    The Association argues that the current owner of the maintenance shed is a necessary party to this action because the declarations RSA has sought involve the validity of a lien against that property. Having affirmed the circuit court's dismissal of RSA's claim for declaratory relief, that of course is no longer a specific concern. But even if litigation of RSA's claim for tortious interference requires the circuit court to pass on the validity of the release and the lien, there is no risk that the lien will reemerge as a limitation on the new owner's rights. The only theory of recovery RSA has advanced is that the release was invalid (and the interference unjustified)

precisely *because* the lien was invalid. There is simply no risk, based on the RSA's present allegations, that the lien will be reimposed on the Maintenance Shed or that its new owner has any "present and substantial" (internal quotation marks omitted) (*id.*) interest in the outcome of this litigation.

¶ 52    The Association also posits that the circuit court might construe the class action settlement agreement in a way that could negatively affect the new owner's rights and duties vis-à-vis the Maintenance Shed. But it fails to provide any example of how or why that might occur. In sum, the Association has not convinced us that joinder is necessary here. Even if it were, section 2-407 of the Code provides that "[n]o action shall be dismissed *** for nonjoinder of necessary parties without first affording reasonable opportunity to add them as parties." 735 ILCS 5/2-407 (West 2022). Where the circuit court did not consider this argument, RSA was given no such opportunity, and it would therefore be improper for us to affirm the dismissal on this alternative basis.

¶ 53    The Association next invites us to resolve this case on the merits, affirming the circuit court's dismissal of the complaint on the basis that the lien on the Maintenance Shed was valid and RSA was therefore never entitled to any of the relief it sought. This would require us to accept the Association's interpretation of the language in the settlement agreement—which it contends permits a lien on any parcel that was once part of the Retained Property—over RSA's interpretation—that because payment of the gate costs is the sole responsibility of the Clubhouse owner, a lien for the nonpayment of those costs can only properly be recorded against the Clubhouse. It is true both that we may affirm the circuit court's dismissal for any reason appearing in the record (*Burton v. Airborne Express, Inc.*, 367 Ill. App. 3d 1026, 1033 (2006)) and that the construction of a contract presents a legal issue that we review *de novo* (*Valerio v. Moore Landscapes, LLC*, 2021 IL 126139, ¶ 20). But even if we were to resolve this legal issue in the

18

Association's favor, dismissal on this basis is not warranted.

¶ 54    The Association argues in its brief that "public records unequivocally demonstrate that the Maintenance Shed is part of the Retained Property." RSA counters in its reply brief that the "contention that the Maintenance Shed is part of the 'Retained Property' even though it is not included in the extensive list of parcels that comprise the Retained Property is *** completely baseless." The documents relied on by the Association contain, as its counsel acknowledged at argument in this court, pages of complicated metes and bounds descriptions of the various parcels, which are indecipherable without explanatory testimony. The settlement agreement that RSA relies on simply describes the properties at issue in general terms that may or may not determine whether the Maintenance Shed is part of the Retained Property.

¶ 55    There is clearly both a factual and a legal dispute that must be resolved to determine the validity of the lien. Even if a lien is proper on any part of the retained property—an issue which we do not decide, the factual question remains as to whether the Maintenance Shed is part of the Retained Property. That question, and the underlying premise that a lien is proper anywhere on the Retained Property, may ultimately be resolved in the Association's favor, perhaps on summary judgment. However, we disagree that it can be resolved in that manner at this juncture.

¶ 56                                D. Reassignment on Remand

¶ 57    Finally, although RSA includes a request for reassignment on remand to a different judge in its prayer for relief, it makes no argument for why such relief is warranted in this case. Points not argued are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). The request is therefore denied.

¶ 58                                IV. CONCLUSION

¶ 59    For all of the above reasons, we affirm the circuit court's dismissal of RSA's claim for declaratory relief and reverse its dismissal of RSA's claim for tortious interference with contract.

19

The case is remanded for further proceedings consistent with this opinion.

¶ 60    Affirmed in part and reversed in part; cause remanded.

*RSA Properties Mission Hills, P.C., v. Mission Hills Homeowners Ass'n,*
**2024 IL App (1st) 231526**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-11902; the Hon. Caroline Kate Moreland, Judge presiding. |
| **Attorneys for Appellant:** | Kurt H. Feuer, of Evanston, for appellant. |
| **Attorneys for Appellee:** | Elizabeth A. Thompson, of Saul Ewing LLP, of Chicago, for appellee. |